## COMMONWEALTH *vs.* QUIN HARKESS.

No. 93-P-489.

Suffolk. October 8, 1993. - December 16, 1993.

Present: FINE, KAPLAN, & GILLERMAN, JJ.

*Search and Seizure*, Threshold police inquiry, Probable cause. *Constitutional Law*, Search and seizure, Admissions and confessions. *Probable Cause. Words*, "Seizure," "Custodial interrogation."

Police officers had reasonable suspicion based on more than mere flight, within the meaning of *Terry* v. *Ohio*, 392 U.S. 1 (1968), to justify the pursuit of a fleeing defendant, thus the seizure of a gun in the immediate vicinity after the defendant's stop was lawful. [631-632]

An incriminating statement made by a defendant, after his arrest but before Miranda warnings were given, was not the product of a custodial interrogation and was properly admitted in evidence. [632]

COMPLAINT received and sworn to in the Roxbury Division of the District Court Department on October 11, 1991.

On appeal to the jury session of the Dorchester Division, pretrial motions to suppress evidence were heard by *Robert P. Ziemian*, J., and the cases were tried before him.

*Lois J. Martin* for the defendant.

*Katherine E. McMahon*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Upon a six member jury trial in District Court, the defendant was convicted of the crimes of unlawfully carrying a firearm (G. L. c. 269, § 10[*a*]) and unlawful possession of ammunition (G. L. c. 269, § 10[*h*]). He appeals and claims that the judge erred in failing to suppress the physical evidence and also a statement made to the police.

Gerald Bailey, a Boston police officer assigned for three years past to Area B2, Roxbury, was the sole witness on the motion to suppress. The facts as reconstructed ran thus.

On October 11, 1991, about 3:00 A.M., Bailey and his partner, Officer Bernard Green, were in a marked cruiser patrolling the Mission Hill housing development, a high crime area (drugs and guns). As they went through Horadan Way, turning into Cornelia Court, Bailey observed two men standing and talking in front of the doorway of No. 55 Cornelia Court. When he saw these men at a distance of fifty or sixty feet, they saw him. Bailey recognized one of the men, the present defendant; although Bailey had had no dealings with the defendant, the defendant had been pointed out to him, and he had information from State police and Area B2 detectives that the defendant with a few others were from New York and were involved in sales of drugs and guns in the Mission Hill area.

As eye contact was made, the two men turned and ran through the doorway. The officers left the cruiser and ran in pursuit. Bailey followed the defendant up the stairwell of No. 55. The other man had run through No. 55 into another courtyard, with Green following. The defendant was fifteen feet ahead of Bailey up the three or four flights of stairs, but Bailey for a moment lost sight of the defendant as the defendant reached the top of the stairwell and went out to the roof. As Bailey emerged to the roof with drawn gun, he went to his right. Hearing a noise, he turned. The defendant approached from the left rear of the roof with his hands raised and said, "I give up." Fearing for his own safety — considering the hour, the size of the defendant, the flat, open roof — Bailey ordered the defendant down and handcuffed him. Officer Green, who had lost his man, made his way to the roof (perhaps Bailey had called down to him). Now Bailey looked about and found on the "penthouse" (an enclosure about six feet high at the head of the stairwell) a nine millimeter handgun, with a live round in the chamber and sixteen in the magazine.

Green conducted the defendant down the stairs, Bailey following with the captured gun in hand. Either on the roof after the gun was found, or on the street, the defendant was told he was under arrest for firearms violation. As the de-

fendant was being put into the backseat of the cruiser, he
said, "The gun isn't mine, but I know whose it is." No ques-
tions had been put to the defendant. He was taken to the
station for booking and was then given Miranda warnings.

1. *Refusal to suppress gun and ammunition.* The defend-
ant argues that the police took these things unlawfully, in
consequence of a violation of the Fourth Amendment (and
Fourteenth) to the United States Constitution.

The defendant questions the legality of Officer Bailey's
pursuit of him. The Supreme Court has spoken to the point.
In *California* v. *Hodari D.*, 499 U.S. 621 (1991) (7 to 2 de-
cision), two police officers on patrol in an unmarked cruiser,
dressed in street clothes but wearing jackets with "Police"
marked front and back, saw four or five youths huddled
around a small parked red car. It was a high crime area in
the city of Oakland. When the youths, including Hodari, saw
the officers' cruiser approaching, they fled, and the red car
took off. One of the officers chased Hodari, got ahead of him
on a parallel street, then turned back. Hodari, looking behind
him as he ran, did not turn and see the officer until the of-
ficer was nearly upon him. At that point he tossed away what
appeared to be a small rock. The officer tackled Hodari and
handcuffed him. The rock was found to be crack cocaine.

In the juvenile proceedings, Hodari could argue for sup-
pression of the cocaine as evidence on the basis of the famil-
iar cases of *Terry* v. *Ohio*, 392 U.S. 1 (1968), and *United
States* v. *Mendenhall*, 446 U.S. 544 (1980). These combined
in the doctrine that a person was "seized" within the mean-
ing of the Fourth Amendment when the police acted in such
a way that the person would believe, in reason, that he was
not free to leave; the seizure could then be justified if it was
shown that the police acted upon a reasonable, articulable
suspicion that the person was engaged or about to engage in
criminal activity. In *Hodari*, California conceded that such
suspicion was not shown. The Supreme Court departed from
*Terry-Mendenhall* and held, relying on a common law defini-
tion of arrest, that Fourth Amendment seizure means either
the application of physical force to the person or submission

of the person to an assertion of authority; and when the police have not encompassed a seizure so defined, they need not justify by showing suspicion of crime. So suppression of the cocaine could not be upheld.

Although Justice Scalia, for the majority, did not persuade Justices Stevens and Marshall, the *Hodari* decision of course fixes the meaning of the Fourth Amendment for us. That decision could control the case at bar: just as Hodari was considered not to have been seized at the moment he saw the officer and cast away the cocaine, so Harkess had not been seized when, knowing the officer was in near pursuit, he disposed of the gun on the penthouse. Any issue of reasonable suspicion falls away. This may be taken to conclude the present appeal in favor of the Commonwealth.

The question suggests itself, however, whether art. 14 of our Declaration of Rights grants greater liberty to the individual than the Fourth Amendment as construed in *Hodari*. For present purposes, this is to ask the question whether art. 14 should be held to constitutionalize for the Commonwealth the *Terry-Mendenhall* doctrine. The highest courts of a few States have in fact already decided by reference to their respective State Constitutions to hew to these older precedents. See *State* v. *Oquendo*, 223 Conn. 635 (1992); *State* v. *Quino*, 74 Haw. 161 (1992); *Matter of Welfare of E.D.J.*, 502 N.W.2d 779 (Minn. 1993).

Faced with this temerarious inquiry, our courts have pretty consistently applied the *Terry-Mendenhall* test, expressly or impliedly, while dealing only scantily with *Hodari*, and disclaiming any intention to answer the art. 14 issue.[1]

We develop these points. To go back to Justice Scalia's opinion in *Hodari*, he emphasized that California had conceded in effect that admission in evidence of the cocaine could not be justified under *Terry-Mendenhall*. Accepting

---

[1] We can claim to be relieved of any duty to consider art. 14 because the defendant herein effectively did not ask the benefit of it either at trial or on this appeal. So also there is doubt whether, as the intermediate appellate court, we would do better to await the definitive resolution of the constitutional issue by the Supreme Judicial Court, than to attempt to decide it ourselves.

California's concession, Justice Scalia doubted that the concession was necessary. He wrote (499 U.S. at 623 n.1): "That it would be unreasonable to stop, for brief inquiry, young men who scatter in panic upon the mere sighting of the police is not self-evident, and arguably contradicts proverbial common sense. See Proverbs 28:1 ('The wicked flee when no man pursueth'). We do not decide that point here, but rely entirely upon the State's concession."

In the present case, the Commonwealth, besides pressing *Hodari*, makes no concession and contends that the police acted on reasonable suspicion, based, the Commonwealth would say, on more than mere flight.

We pass to our precedents about reasonable suspicion justifying a *Terry*-type stop in "flight" cases, starting at the beginning. In *Commonwealth v. Battle*, 365 Mass. 472 (1974), the court, applying the conventional pre-*Hodari* standard, said broadly: "On seeing two persons run into an apartment building in apparent response to an approaching police vehicle, the police had the right — if not the duty — to conduct further visual investigation while the two persons remained in public view. Such police conduct is not a search or seizure, however expansively one wishes to interpret those terms, and therefore a lack of probable cause to arrest or even ground to conduct a 'stop and frisk' is irrelevant. The requirements of the Fourth Amendment . . . enter into the picture at a later point in this case, when the arrest was actually made." *Id.* at 475 (footnote omitted). This seems almost to anticipate the holding in *Hodari*. In *Commonwealth v. Thibeau*, 384 Mass. 762 (1981), however, the court looked for and failed to find reasonable suspicion where it was the police who started a chase upon no more than a hunch (not to be counted was an individual's attempt to elude the police after they initiated pursuit). The necessary suspicion existed in *Commonwealth v. Wren*, 391 Mass. 705 (1984): an individual's attempt to avoid contact or observation by the police was not itself enough to base reasonable suspicion but could be considered with other factors, here including an appearance of "casing" a location or awaiting a rendezvous. *Commonwealth v.*

*Borges*, 395 Mass. 788 (1985), suggests that a tip from an unidentified informant might suffice to ground suspicion and thus justify a prompt stop (but here the police later exceeded the investigatory scope permitted by *Terry*). So also there was suspicion enough in *Commonwealth* v. *Sanchez*, 403 Mass. 640 (1988), where a person, alighting at an airport and questioned by the police about carrying narcotics, consented to inspection but then broke and ran.

*Commonwealth* v. *Fraser*, 410 Mass. 541 (1991), was decided after *Hodari*, but applied *Mendenhall*. The court said the police officer did not "seize" an individual in the sense of sealing his freedom of movement when he identified himself as a police officer and asked him to take his hands out of his pockets. The court cited *Hodari* as a "cf." and said the defendant had waived an art. 14 claim by making an inadequate appellate argument. *Id.* at 543 n.3. *Commonwealth* v. *Laureano*, 411 Mass. 708 (1992), can take its place as another example of such nonseizure, with the court putting to one side both *Hodari* and art. 14. In our own court, there is in *Commonwealth* v. *Pena*, 31 Mass. App. Ct. 201 (1991), a claim that counsel did not provide effective assistance because he failed to move to suppress physical evidence. The court sought to distinguish *Hodari* and *Battle* on their facts and concluded that the case must be remanded for further evidence on whether the police had reasonable suspicion. The opinion stated that it took no position whether, on facts like *Hodari*, art. 14 provides more protection of the citizen than the Fourteenth Amendment. *Commonwealth* v. *Marrero*, 33 Mass. App. Ct. 440 (1992), finds reasonable suspicion on the basis of the individual's self-activated flight together with other features including a prior break-in at the locus and some signs of a current one. Article 14 contentions were pretermitted.[2]

Set against this roundup of the decisions, the facts at bar establish reasonable suspicion, as the motion judge found.

---

[2]*Hodari* is also referred to briefly in *Commonwealth* v. *Willis*, 415 Mass. 814, 817 n.4 (1993), and *Commonwealth* v. *Houle*, *ante* 474, 476 (1993).

Apart from the rather equivocal facts that this was a high crime area and the time 3:00 A.M., the defendant had been pointed out to Officer Bailey, Bailey had information connecting the defendant to a drug and gun group operating at Mission Hill, and the defendant fled on his own propulsion, not in reaction to an incursion by the police. Thus the case against suppression of gun and ammunition is proved on conventional grounds, and we leave art. 14 to another day. The question of art. 14 is reserved for a case of a stop where reasonable suspicion according to *Terry* is lacking.

2. *Refusal to suppress defendant's statement.* It is regrettable that the defendant was not given Miranda warnings on the spot at the time of his arrest, but it does not follow that his statement should be suppressed. The question is whether the statement was the product of custodial interrogation, meaning thereby "express questioning or its functional equivalent." *Rhode Island* v. *Innis*, 446 U.S. 291, 300-301 (1980). True, the defendant could have seen the gun in Officer Bailey's hand, but in the circumstances there is little basis for equating this with an imagined accusatory police question, "How do you explain *this*?" The gun was not thrust on the defendant, and he would not have felt it as an implicit demand for an explanation. The gun was simply a piece of evidence collected at the scene and was handled as such. For a contrasting situation where the display of drugs to a suspect at the scene was held the equivalent of custodial interrogation, see *Commonwealth* v. *Rubio*, 27 Mass. App. Ct. 506, 512-513 (1989).

*Judgments affirmed.*