COMMONWEALTH vs. LEROY WILLIAMS.

Suffolk. November 8, 1995. - February 20, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, O'CONNOR, & GREANEY, JJ.

*Evidence,* Admissions and confessions. *Practice, Criminal,* Motion to suppress, Required finding, Capital case. *Search and Seizure,* Threshold police inquiry, Arrest. *Constitutional Law,* Admissions and confessions, Search and seizure, Arrest. *Firearms. Homicide. Joint Enterprise. Malice. Intent.*

There was no error in a Superior Court judge's denial of a criminal defendant's motion to suppress statements and physical evidence, where the police officers who ultimately arrested the defendant observed the defendant running, appropriately pursued the defendant to effectuate a threshold inquiry, and did not exceed the scope of a lawful investigatory stop by restraining the defendant's liberty of movement while conducting the inquiry; the defendant's subsequent arrest on probable cause was lawful. [115-120]

At the trial of indictments for unlawful carrying of a firearm and murder there was no error in the judge's denial of the defendant's motions for required findings of not guilty, where the evidence allowed a rational jury to have inferred that the defendant acted with deliberately premeditated malice aforethought by bringing a loaded revolver to the victim's apartment and shooting him three times. [120-123]

At a criminal trial, no substantial likelihood of a miscarriage of justice appeared in the judge's consideration of certain eyewitness evidence in determining whether police had reasonable suspicion to justify a threshold inquiry of the defendant. [123-124]

At a murder trial there was no substantial likelihood of a miscarriage of justice from the absence of an instruction on the defendant's intoxication where the evidence of impairment was minimal or nonexistent. [124]

INDICTMENTS found and returned in the Superior Court Department on July 5, 1989.

A pretrial motion to suppress evidence was heard by *Elizabeth J. Dolan,* J., and the cases were tried before *John F. Murphy, Jr.,* J.

*Earl Howard* for the defendant.

*Kelly Ann Downes,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. The defendant, Leroy Williams, appeals from his convictions of murder in the first degree and unlawful carrying of a firearm.[1] The defendant also appeals from the denial, after a hearing, of his motion to suppress all evidence obtained as the result of his arrest and the denial of his motion for required findings of not guilty. We conclude that the conviction for murder in the first degree should be affirmed. We decline to exercise our extraordinary power under G. L. c. 278, § 33E (1994 ed.), to enter a verdict of a lesser degree of guilt or order a new trial. We also affirm the conviction for unlawful carrying of a firearm.

We set forth the facts in the light most favorable to the Commonwealth. *Commonwealth* v. *Nichypor*, 419 Mass. 209, 210 (1994). *Commonwealth* v. *Salemme*, 395 Mass. 594, 595 (1985). On June 26, 1989, the victim, Leroy Foster, died from multiple gunshot wounds to the chest and arm. The fatal shooting took place at about 11:15 A.M. Gunshots were heard by three witnesses, Sheba Brown, Kevin Boswell, and Fitz Lindo, who saw the defendant and another man flee the building immediately after the shots were fired. Both Boswell and Lindo testified that the defendant was carrying a gun which Boswell described as large, approximately seven to eight inches long, silver with a black handle.[2] Boswell and Lindo saw the defendant throw something over a fence into an empty lot.[3]

At the time of the shooting, Boston police Officers Paul C.

---

[1]The defendant also was convicted of unlawful possession of a Class D controlled substance (marihuana) and trafficking in cocaine. He limits his arguments on appeal to the convictions of murder in the first degree and unlawful carrying of a firearm. The motion for required findings of not guilty similarly referenced only those charges. As the defendant makes no argument as to the drug convictions in his appellate brief, we review only the convictions for first degree murder and unlawful carrying of a firearm. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975) ("The appellate court need not pass upon questions or issues not argued in the brief").

[2]There is some dispute as to whether Lindo testified that the second man also carried a gun. The transcript represents the testimony as follows: "First I saw a brown guy with a gun; and, then, after a split second, I saw another guy, a dark gun." The Commonwealth asserts this was a typographical error by the court reporter who meant to type "a dark guy." This is the only evidence that the second man carried a gun.

[3]The police later conducted an extensive search of the empty lot identified by the witnesses but did not recover the gun.

McLaughlin and Daniel Fagan were on patrol in a two-man cruiser traveling inbound on Washington Street toward Codman Square in the Dorchester section of Boston at a slow rate of speed. On reaching the intersection of Washington and Aspinwall Streets, Officer McLaughlin observed two black males running at "sprint pace" down Washington Street. He observed that bystanders had turned toward the runners and were pointing at them. He saw the defendant pull a white shirt over his head and discard it.[4] McLaughlin also noticed that this man was sweating and had a strained expression on his face.

As the officers began to follow the men, an unidentified white, middle-aged man approached the cruiser and handed Officer Fagan a beeper, stating, "I don't know what happened but one of them dropped this."[5] The officers continued to follow the men but did not activate the cruiser's lights or siren, nor call to the men to stop. Neither man turned to look at the cruiser. On Hopestill Street, the officers observed the defendant run behind a house. Officer Fagan got out of the cruiser to investigate while McLaughlin drove the cruiser around the corner to Talbot Avenue. Officer McLaughlin then stopped the cruiser and proceeded to investigate on foot. He observed the defendant, who he now noticed was covered with blood, attempt to scale a chain link fence. McLaughlin identified himself as a police officer and ordered the defendant to stop. The defendant retreated back through the yards. At this point, Officer McLaughlin drew his service revolver and followed the defendant. He located the defendant behind a blue house and again ordered him to stop and get on the ground. The defendant stated, "I didn't mean it, I didn't mean it, I don't want to go back to prison."[6] The defendant also stated that he had been shot but the officer observed no

---

[4]This action also was observed by Mia Tuwen who was at work in the Codman Square Cleaners at 563 Washington Street. She saw the man take off his shirt and discard it on the ground near a mailbox in front of her store. She later identified the shirt for police. The shirt was tested for the presence of human blood and found to contain type A human blood, the victim's blood type.

[5]Al Camarata, an employee of Metro Media Paging, stated that the beeper was leased to Leroy A. Foster, the victim.

[6]The latter part of the defendant's statement, "I don't want to go back to prison," was excluded at trial but not at the hearing on the motion to suppress.

wounds. As Officer Fagan arrived, the defendant got up and attempted to run past Officer McLaughlin. Both officers pushed the defendant to the ground and attempted to handcuff him as he resisted.

While handcuffing the defendant, the officers received a radio broadcast reporting a confirmed shooting at 544 Washington Street, approximately 200 to 400 yards from where they had stopped the defendant. In response to Officer Fagan's request for a description of the suspects, the dispatcher described a short, dark-skinned, black male and a tall, light-skinned, black male, shirtless and covered with blood. Fagan reported that the latter description matched that of an individual they now had in custody and was instructed to bring the suspect back to the scene of the shooting.

On route to 544 Washington Street, the defendant was read the warning required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and shown to the civilian witnesses. See *Commonwealth* v. *Bumpus*, 362 Mass. 672, 675 (1972), judgment vacated and remanded on other grounds, 411 U.S. 945 (1973), aff'd on rehearing, 365 Mass. 66 (1974), reviewed on petition for habeas corpus sub nom. *Bumpus* v. *Gunter*, 452 F. Supp. 1060 (D. Mass. 1978), denial of writ aff'd, 635 F.2d 907 (1st Cir. 1980), cert. denied, 450 U.S. 1003 (1981) (defendant may be shown to witnesses for identification prior to arrest). Both Lindo and Boswell identified the defendant as one of the two men they had seen running from the apartment following the gunshots. The defendant was then searched for weapons. The police recovered two plastic bags on the defendant's person, one containing a substance later identified as cocaine and the other a substance later identified as marihuana.[7] The defendant was then taken to the police station and booked. During the search incident to booking, the police discovered, on the defendant's person, a BayBank Express card in the name of Norris A. Foster. The defendant admitted that the card

---

[7]A police expert, Sergeant Detective Gil Griffiths, testified that, in his opinion, given the amount and purity of the cocaine found on the defendant's person, it was intended for distribution purposes. He estimated the street value of the cocaine as approximately $4,500 and the value of the marihuana as approximately $200 to $225.

belonged to the victim, Leroy Foster.[8] The defendant's cap, pants, and sneakers were taken for blood analysis at the request of the assistant district attorney. The analysis revealed the presence of human blood but the blood type could not be determined.

Later investigation at the scene of the shooting revealed all windows, except those facing the front of the apartment, were shut and locked. There was no practical means of leaving the building other than the front door and no persons were found in the hallway or corridors of either building.

An autopsy of the victim revealed that he had sustained three gunshot wounds, two to the chest and one to the upper right arm. The first chest wound appeared to be a distance wound. From observation of stippling around the second wound, the medical examiner determined that this wound was inflicted at close range. The medical examiner determined that either chest wound was fatal.

I. *Motion to suppress.* The defendant sought to suppress all physical evidence and his statements. He argued that the stop and subsequent arrest were unlawful and in violation of his rights under art. 14 of the Massachusetts Declaration of Rights.[9] The judge denied the defendant's motion to suppress stating that the police officers had "specific and articulable facts to warrant the initiation of a pursuit" and that the officers' suspicion reasonably escalated so that at the time of confrontation between Officer McLaughlin and the defendant "a *Terry*-type stop and frisk, at the very least, was warranted." See *Terry* v. *Ohio*, 392 U.S. 1 (1968).

The Commonwealth bears the burden of demonstrating that the police officers acted lawfully in pursuing and seizing

[8]The victim's brother, Norris Foster, confirmed at trial that he previously had given the bank card to the victim.

[9]Article 14 of the Massachusetts Declaration of Rights provides greater substantive protection to a criminal defendant than does the Fourth Amendment to the United States Constitution. We view the contested stop and subsequent arrest in light of the more stringent standards of art. 14 with the understanding that, if these standards are met, so too are those of the Fourth Amendment. See *Commonwealth* v. *Welch*, 420 Mass. 646, 650 n.3 (1995).

In his brief, the defendant does not state what standard we should adopt or in what regard our cases on stop and frisk differ from Federal cases but cites both Federal and State cases in support of his claim. We, therefore, analyze both art. 14 and Fourth Amendment cases.

the defendant. *Commonwealth* v. *Shields,* 402 Mass. 162, 164 (1988). The degree of suspicion the police reasonably harbor must be proportional to the level of intrusiveness of the police conduct. *Commonwealth* v. *Moses,* 408 Mass. 136, 141 (1990). *Commonwealth* v. *Borges,* 395 Mass. 788, 794 (1985).

We first consider whether the confrontation in the back yards at Aspinwall Street was a permissible investigatory stop. See *Commonwealth* v. *Willis,* 415 Mass. 814, 817 (1993) (to conduct threshold inquiry, police officer must have reasonable suspicion, based on specific, articulable facts and reasonable inferences that the defendant has committed, is committing, or was about to commit crime). See also *Terry* v. *Ohio, supra.* Review of the officers' conduct in effectuating a threshold inquiry requires a two-part analysis: first, whether it was permissible to initiate investigation and second, whether the scope of the seizure was justified by the situation. See *Terry* v. *Ohio, supra* at 19-20. See also *Commonwealth* v. *Helme,* 399 Mass. 298, 300 (1987); *Commonwealth* v. *Silva,* 366 Mass. 402, 405 (1974). We view the facts and circumstances as a whole in assessing the reasonableness of the officers' conduct. See *Commonwealth* v. *Fraser,* 410 Mass. 541, 545 (1991) ("a combination of factors that are each innocent of themselves may, when taken together, amount to the requisite reasonable belief"); *Commonwealth* v. *Thibeau,* 384 Mass. 762, 764 (1981).

The defendant focuses his argument on the first prong of the two-part analysis. He argues that the police had no reasonable and articulable suspicion justifying pursuit, which the defendant contends initiated when the police began to follow him in the cruiser. We do not agree. When the police first spotted the defendant running and decided to follow in their cruiser, they were merely observing rather than pursuing the defendant. No degree of suspicion, reasonable or otherwise, was constitutionally required for the police to commence surveillance. *Michigan* v. *Chesternut,* 486 U.S. 567, 576 (1988) (police not required to have particularized and objective basis for suspecting criminal activity to follow in car). The police conduct prior to chasing on foot was not pursuit as it would not have communicated to the reasonable person an attempt to capture or otherwise to intrude on the defendant's freedom of movement. See *id.* at 575 (observation without activation of siren or flashers, without command to halt, without display

of weapons, and without operation of car in aggressive manner to block defendant's course or otherwise control the direction or speed of his movement, is not pursuit). Our case law is consistent with the Federal law on this point. See *Commonwealth* v. *Harkess*, 35 Mass. App. Ct. 626, 629 (1993) (in absence of seizure, there is no need for the police to justify their conduct by showing a reasonable suspicion of criminal activity); *Commonwealth* v. *Moore*, 32 Mass. App. Ct. 924, 924 (1992), and cases cited (surveillance does not implicate constitutional protections).

Pursuit for constitutional purposes began when the officers left the police cruiser and began to chase the suspects on foot. At this time, the police were attempting to stop the defendant to effectuate a threshold inquiry. We conclude that the police then possessed the requisite reasonable suspicion necessary to justify a threshold inquiry. The defendant was running down a busy street at sprint pace in broad daylight. The police could properly consider that the defendant's flight predated the officers' pursuit, rather than being in response to it. See *Michigan* v. *Chesternut, supra* at 576; *Commonwealth* v. *Harkess, supra* at 630 (appropriate for officers to investigate when individual flees without any show of authority by the police officers). The defendant was sweating, had a strained expression on his face, and discarded his shirt without breaking pace. The police, without solicitation, received a beeper dropped by the defendant (or his unnamed joint venturer). The defendant then took evasive action by running through back yards and scaling chain link fences. It was appropriate for the police to pursue the defendant in order to effectuate a threshold inquiry.

We next turn to the second prong, whether the scope of the seizure was justified by the situation. We conclude that it was appropriate for Officer McLaughlin to approach the defendant with his gun drawn. An officer is entitled to take reasonable steps to ensure his safety. Such steps do not automatically turn a stop into an arrest. See *Commonwealth* v. *Fitzgibbons*, 23 Mass. App. Ct. 301, 305 (1986). When the defendant attempted to flee, the officers physically restrained him. It is not disputed that at this point the defendant was

seized for constitutional purposes.[10] See *Commonwealth* v. *Fraser*, 410 Mass. 541, 543 (1991), citing *United States* v. *Mendenhall*, 446 U.S. 544, 554 (1980) (seizure occurs "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"). What is disputed is whether this seizure was an investigatory stop or an arrest. The resolution of this question depends on the particular facts of the case. *Commonwealth* v. *Fitzgibbons*, 23 Mass. App. Ct. 301, 307 (1986). It is not dispositive that the defendant was handcuffed. See *Commonwealth* v. *Andrews*, 34 Mass. App. Ct. 324, 329 (1993); *Commonwealth* v. *Pandolfino*, 33 Mass. App. Ct. 96, 98 (1992). See also *United States* v. *Bautista*, 684 F.2d 1286, 1289-1290 (9th Cir. 1982), cert. denied, 459 U.S. 1211 (1983); *United States* v. *Laing*, 889 F.2d 281, 285-286 (D.C. Cir. 1989), cert. denied sub nom. *Martin* v. *United States*, 494 U.S. 1008 (1990). Several factors must be considered in determining whether the scope of the seizure was justified, including the length of the encounter, the nature of the inquiry, the possibility of flight, and the danger to the safety of the officers.

The defendant was immediately transported to the crime scene for identification and thus was not unduly detained. See *Commonwealth* v. *Salerno*, 356 Mass. 642, 646-647 (1970), quoting *Ker* v. *California*, 374 U.S. 23, 34 (1963) ("An expeditious collateral inquiry which might result in the suspects' arrest or prompt release is not unreasonable when done to meet 'the practical demands of effective criminal investigation and law enforcement' "); *Commonwealth* v. *Crowley*, 29 Mass. App. Ct. 1, 5 (1990) (transportation back to crime scene did not unduly prolong detention since only twenty minutes was involved). The defendant posed a substantial flight risk given that he tried to flee after the officer ordered him to stop. He also posed a significant safety risk. The officers saw that the

---

[10]There is no basis for the defendant's contention that he was seized prior to the confrontation with the officer as the defendant was unaware of the officers' pursuit. There was neither physical force nor an assertion of authority that effectuated a stop. See *California* v. *Hodari D.*, 499 U.S. 621, 627-629 (1991) (seizure does not occur during a chase that does not produce the suspect's stop). See also *Commonwealth* v. *Cook*, 419 Mass. 192, 199-200 (1994) (no seizure unless reasonable person would have believed he was not free to leave). Under either State or Federal case law, the defendant was not seized prior to the confrontation.

defendant was covered in blood and could ascertain that he lied about having been shot. It was reasonable for the officers to be concerned that the defendant might be armed and might pose a risk to their safety, as well as the public's. Officers Mc-Laughlin and Fagan were justified in restraining the defendant's liberty of movement while they conducted a threshold inquiry. Such restraint, which was limited in duration and necessary to complete the inquiry, does not turn a valid investigatory stop into an unlawful arrest. See *Commonwealth v. Crowley*, 29 Mass. App. Ct. 1, 4-5 n.6 (1990) ("Contrary to the defendant's suggestion, the criteria of 'forcible detention and restriction of movement — do not serve to distinguish an arrest from an investigatory stop. A complete restriction on liberty of movement occurs in the typical investigatory stop' "). On consideration of these factors, we conclude that the police did not exceed the scope of a lawful investigatory stop when they restrained the defendant.

At the point when the officers had successfully restrained the defendant, they received the radio transmission confirming that a shooting had taken place 200 to 400 yards from where they confronted the defendant. This was sufficient to supply probable cause to arrest.[11] At or near the scene of the shooting, the officers had seen bystanders staring at and pointing to the defendant and his companion. One bystander informed the officers that the suspects dropped a "beeper," an accoutrement of the drug trade. The officers witnessed the suspects run and dart evasively through back yards and the defendant discard his shirt. The defendant was covered in blood and when cornered by the officers stated "I didn't mean it. I didn't mean it. I don't want to go back to prison." He then lied about being shot and attempted to flee. After receiving the radio transmission confirming a shooting nearby, it was proper for the officers to arrest the defendant on probable cause to believe he was involved in that shooting.[12]

Because the arrest was proper, the police were authorized

---

[11]Probable cause to arrest exists where the facts and circumstances in the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in believing that an offense has been or is being committed. See *Commonwealth* v. *Roman*, 414 Mass. 642, 643 (1993); *Commonwealth* v. *Garcia*, 34 Mass. App. Ct. 386, 393 n.8 (1993).

[12]Because we conclude that the police had probable cause to arrest at the time of the radio transmission, we need not discuss the question whether,

to search the defendant's person for weapons, contraband, and evidence. See G. L. c. 276, § 1 (1994 ed.); *Commonwealth v. Petrillo*, 399 Mass. 487, 489 (1987). It also was proper to seize as evidence the clothing and shoes worn by the defendant at the time of arrest. *Commonwealth v. Freiberg*, 405 Mass. 282, 299, cert. denied, 493 U.S. 940 (1989). We conclude that there was no error in the trial judge's denial of the defendant's motion to suppress.

II. *Motion for required findings of not guilty.* The defendant moved for required findings of not guilty as to the murder and unlawful carrying of a firearm charges at the end of the Commonwealth's case and at the end of all evidence. Both motions were denied. The defendant asserts that the denials were in error.

A motion for a required finding of not guilty will be allowed only where the trial judge finds that "the evidence is insufficient as a matter of law to sustain a conviction on the charge." Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979). Accord *Commonwealth v. Nadworny*, 396 Mass. 342, 353-354, cert. denied, 447 U.S. 904 (1985).

A. *The unlawful carrying of a firearm.* To prove unlawful carrying of a firearm, the Commonwealth must prove that the defendant knowingly possessed a loaded or unloaded firearm without a license. G. L. c. 269, § 10 (*a*) (1994 ed.). The defendant argues that there was insufficient evidence to convict . him of the unlawful carrying of a firearm because there was "no evidence that the firearm claimed to be in the possession of the defendant . . . was capable of being fired or was fired at all." The defendant's argument is without merit. The jury could properly have considered eyewitness testimony that the defendant had a firearm in his possession, even in the absence

as the Commonwealth contends, the arrest was not effectuated until after the defendant was transported back to the crime scene and identified by the civilian witnesses. The Commonwealth argues that, although the police had probable cause for arrest at the time of the radio transmission, they did not arrest the defendant until after he had been transported back to the crime scene, read the Miranda warnings, and identified by the civilian witnesses. See *Commonwealth v. Bumpus*, 362 Mass. 672, 675 (1972), judgment vacated and remanded on other grounds, 411 U.S. 945 (1973), aff'd on rehearing, 365 Mass. 66 (1974), reviewed on petition for habeas corpus sub nom. *Bumpus v. Gunter*, 452 F. Supp. 1060 (D. Mass. 1978), denial of writ aff'd, 635 F.2d 907 (1st Cir. 1980), cert. denied, 450 U.S. 1003 (1981) (defendant may be shown to witnesses for identification prior to arrest).

of the recovery of such a firearm. *Commonwealth* v. *Lopez,* 10 Mass. App. Ct. 351, 354 (1980). It is sufficient that a gun was fired and the defendant was seen fleeing the scene within seconds of the gunshots. A conviction may be properly based entirely on circumstantial evidence so long as that evidence establishes the defendant's guilt beyond a reasonable doubt. *Commonwealth* v. *Martino,* 412 Mass. 267, 272 (1992). See *Commonwealth* v. *Noble,* 417 Mass. 341, 346 (1994) (there need not be direct evidence to shooting). There was no error in the judge's denial of the defendant's motion for a required finding of not guilty as to the unlawful carrying of a firearm charge.

B. *Murder.* The Commonwealth presented a joint venture theory of murder. The three elements required to prove a joint venture beyond a reasonable doubt are that each defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary. See *Commonwealth* v. *Clarke,* 418 Mass. 207, 214 (1994); *Commonwealth* v. *Longo,* 402 Mass. 482, 486 (1988). Viewed in a light most favorable to the Commonwealth, a rational jury could have determined that the Commonwealth proved each of these three elements. The defendant admitted to being present at the scene of the crime. He and a shorter, darker-skinned man entered the building together and fled together. A rational jury could infer from this that they were available and willing to help each other if necessary. Joint venture may be proved by circumstantial evidence, including evidence of flight together. *Commonwealth* v. *Santos,* 402 Mass. 775, 787 (1988). The jury could further infer intent to commit the murder from the carrying of the firearm and the wounds themselves. "Direct evidence of who shot the victim[ ] 'is not required where, as here, there is strong circumstantial evidence that one of the [assailants] shot' the victim[ ]." *Commonwealth* v. *Chipman,* 418 Mass. 262, 268 (1994), quoting *Commonwealth* v. *Cohen,* 412 Mass. 375, 381 (1992). That it is possible that someone else fired the fatal shots does not mean that the jurors were left to speculate as to the defendant's guilt. See *Commonwealth* v. *Doucette,* 408 Mass. 454, 462 (1990). We have held that "[i]n order to convict on circumstantial evidence, it is not necessary to show that it was not in the power of any

other person than the defendant to commit the crime." *Cramer* v. *Commonwealth,* 419 Mass. 106, 112 (1994), quoting *Commonwealth* v. *Fancy,* 349 Mass. 196, 200 (1965). "The relevant question is whether the evidence would permit a jury to find guilt, not whether the evidence requires such a finding." *Commonwealth* v. *Lydon,* 413 Mass. 309, 312 (1992), quoting *Commonwealth* v. *Brown,* 401 Mass. 745, 747 (1988).

To prove murder beyond a reasonable doubt, the Commonwealth must show that the defendant unlawfully killed a human being with malice aforethought. G. L. c. 265, § 1 (1994 ed.). Accord *Commonwealth* v. *Campbell,* 378 Mass. 680, 686 (1979). Malice aforethought describes the particular mental state accompanying a homicide which makes the act murder. *Id.* See *Commonwealth* v. *Ferreira,* 417 Mass. 592, 597 n.7 (1994) ("any intentional killing of a human being without legal justification or excuse, with no extenuating circumstances sufficient in law to reduce the crime from murder to manslaughter, is malicious within the meaning of malice aforethought"). "[M]alice may be found by inference from the defendant's commission of an act which a reasonably prudent person would know is likely to result in the death of another." *Commonwealth* v. *Moore,* 408 Mass. 117, 134 n.9 (1990).

To prove that the murder was murder in the first degree, the Commonwealth proceeded on the theory of deliberate premeditation. To satisfy its burden that the murder was the product of deliberately premeditated malice aforethought, the Commonwealth must show that the defendant's decision to kill was the product of "cool reflection." *Commonwealth* v. *Davis,* 403 Mass. 575, 582 (1988). " 'Cool reflection' merely requires that 'the purpose [be] resolved upon and the mind determined to do it before the blow is struck[;] then it is, within the meaning of the law, deliberately premeditated malice aforethought." *Id.,* quoting *Commonwealth* v. *Tucker,* 189 Mass. 457, 494 (1905). No particular period of reflection is required. *Commonwealth* v. *Chipman, supra* at 269, and cases cited therein. Our case law recognizes that a plan to murder may be formed within a few seconds. *Id.*

Viewed in the light most favorable to the Commonwealth, the evidence allows a rational jury to have inferred that the defendant acted with deliberate premeditation in bringing a loaded revolver to the victim's apartment and firing three

shots into the victim from varying distances. The use of a firearm in the killing is sufficient to support a verdict of murder in the first degree based on deliberately premeditated malice aforethought. *Commonwealth* v. *Bourgeois*, 404 Mass. 61, 63-64 (1989). Evidence that the defendant brought a gun with him to the scene of a planned crime is evidence of planning, which included preparation for using the gun. *Commonwealth* v. *Stewart*, 398 Mass. 535, 541 (1986). The fact that three shots were fired additionally supports the verdict. *Commonwealth* v. *Bourgeois, supra,* citing *Commonwealth* v. *Fernette*, 398 Mass. 658, 669 (1986) ("The facts that the victim was shot twice and that [the defendants] carried loaded handguns, coupled with fair inferences from the circumstances of the shooting, support a finding of sufficient reflection to constitute deliberately premeditated murder"). *Commonwealth* v. *Stirling*, 351 Mass. 68, 75 (1966) ("The [weapon] not being automatic but requiring six separate hard pulls to fire the six shots, and the wounds being in the back of the victim's head without a sign of there having been a struggle, the jury could properly find 'deliberately premeditated malice aforethought' "). We conclude that there was sufficient evidence for a jury to determine that the defendant acted with deliberately premeditated malice aforethought. The judge correctly denied the defendant's motion for a required finding of not guilty.

III. *Relief under G. L. c. 278, § 33E.* The defendant makes two arguments not raised below which we consider pursuant to G. L. c. 278, § 33E. First, the defendant raises the issue of the reliability of the unidentified man who supplied Officer Fagan with the beeper.[13] There were no findings of fact as to the reliability of the bystander or the extent the police relied on the evidence he volunteered. We consider the issue under G. L. c. 278, § 33E, only to determine whether there was serious error that would create a "substantial likelihood of a miscarriage of justice." See *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 230 (1992) (defendant waives right to

---

[13]While the beeper is more relevant to the conviction for trafficking in cocaine, see note 1, *supra,* we consider the defendant's arguments under G. L. c. 278, § 33E, as they relate to the conviction for murder in the first degree. The beeper is relevant as it was a factor in the motion judge's consideration whether the police had reasonable suspicion justifying the pursuit and threshold inquiry that led to the defendant's arrest for the murder.

appeal on grounds not raised before judge; in such circumstances, test is whether there was an error that created a substantial likelihood of a miscarriage of justice). On this record, we conclude that the beeper was sufficiently reliable to be considered in determining whether the police harbored reasonable suspicions justifying a threshold inquiry and that, therefore, there is no substantial likelihood of a miscarriage of justice. The basis of knowledge, an eyewitness account, was clear and constitutionally sufficient. *Commonwealth* v. *Fleurant*, 2 Mass. App. Ct. 250, 254 (1974) ("[e]vidence that the informant was an eye witness is a constitutionally sufficient demonstration of the source of his information"). Reliability was supported by the officers' corroborative observations which may substitute for knowledge of the informant's reliability. See *Commonwealth* v. *Willis*, 415 Mass. 814, 818 (1993); *Commonwealth* v. *Lyons*, 409 Mass. 16, 19 (1990). See also *Spinelli* v. *United States*, 393 U.S. 410 (1969); *Aguilar* v. *Texas*, 378 U.S. 108 (1964). There was no substantial likelihood of a miscarriage of justice as the beeper was sufficiently reliable.[14]

Secondly, the defendant argues that, because he smoked marihuana while with the victim, the question whether he was impaired and unable to form shared intent should have been presented to the jury. See *Commonwealth* v. *Ferreira*, 417 Mass. 592, 595 (1994). At trial, the defendant made no request for a jury instruction on intoxication. The only evidence of impairment presented at trial was the defendant's testimony that the victim gave him marihuana and he smoked it. No testimony was offered as to the amount ingested or inhaled or of an impairment due to the ingestion or inhalation. The evidence of impairment, thus, was either nonexistent or at best minimal. There was no substantial likelihood of a miscarriage of justice from the absence of an instruction on impairment. See *Commonwealth* v. *Fano*, 400 Mass. 296, 306-307 (1987) (defendant did not present defense of intoxication; there was no notice to the judge that intoxication or the defendant's mental capacity was an issue; held, there was no error, much less a substantial likelihood of a miscarriage of justice, in judge's failure to instruct jury sua sponte on effect of voluntary intoxication).

---

[14]We note that the beeper was only a small portion of the accumulating evidence that underlay the reasonable suspicion justifying a threshold inquiry by the police.

We have considered the entire case on the law and the evidence, see G. L. c. 278, § 33E, and we conclude that the interests of justice do not require entry of a lesser degree of guilt as to the murder conviction or a new trial.

*Judgments affirmed.*