## COMMONWEALTH *vs.* GREGORY LELOS.

No. 02-P-1435.

Middlesex. November 19, 2003. - August 17, 2004.

Present: PERRETTA, SMITH, & CYPHER, JJ.

*Practice, Criminal,* Findings by judge, Appeal. *Constitutional Law,* Search and seizure, Arrest. *Search and Seizure,* Threshold police inquiry, Arrest, Probable cause. *Arrest. Probable Cause.*

A Superior Court judge erred in allowing a motion to suppress evidence police officers obtained after stopping a vehicle in which the defendant was a passenger, as the officers' actions in blocking the vehicle, ordering the driver and the defendant out of the car, frisking them for weapons, restricting their movements, and transporting the defendant, who had been advised of his Miranda rights, to the various scenes of his admitted burglaries, were supported by probable cause [629-630]; likewise, an officer's searching of the vehicle in question subsequent to the driver being handcuffed and the defendant being removed from the scene was supported by ample probable cause to arrest the driver for breaking and entering a dwelling house in the daytime with the intent to commit a felony, in violation of G. L. c. 266, § 18 [630-631].

INDICTMENTS found and returned in the Superior Court Department on May 22, 2000.

A pretrial motion to suppress evidence was heard by *Christopher J. Muse,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Martha B. Sosman,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her to the Appeals Court.

*Sara Concannon,* Assistant District Attorney, for the Commonwealth.

*Nona E. Walker,* Committee for Public Counsel Services, for the defendant.

PERRETTA, J. After an evidentiary hearing on the defendant's motion to suppress, a Superior Court judge found that although

the police officers had reasonable suspicion to stop the car in which the defendant was a passenger, the nature of their actions following the stop required a showing of probable cause. Because he concluded that the officers lacked probable cause, he allowed the motion to suppress. On the Commonwealth's appeal, we conclude that the officers' actions were supported by probable cause and reverse the judge's order allowing the motion.

1. *The facts.* We relate the facts as the judge found them to be. On March 31, 2000, a woman made a telephone call to the Belmont police department and reported a suspicious vehicle in her neighborhood. Identifying herself by name, address, and telephone number, the caller told the dispatcher that as she was preparing to leave for a trip, she saw an automobile, with a "kid in a baseball hat," pass by her house about four times. The driver was viewing the houses in the area in a manner which she thought suggested that he was "casing" her neighborhood. The caller gave the dispatcher a description of the car, white with a black roof, and its license plate number, 441YFP.

Belmont police Officer Samuel Bruno was on day-shift duty (7:45 A.M. to 3:45 P.M.) on March 31. Hearing a dispatch message about a suspicious vehicle, he went to the address given by the caller and relayed on the dispatch. However, the caller had apparently departed on her trip and the suspicious car was no longer in the area. Bruno also received dispatch information that a "run" of licence plate number 441YFP revealed that the owner of the vehicle, Michael Lava, had an extensive criminal record, forty-nine entries, which included charges of breaking and entering in the daytime, assaults, and possession of drugs as well as unlicensed firearms. Lava was described as weighing about 203 pounds and being about six feet tall.

At 9:16 A.M., Bruno responded to a house alarm at another location. There he found the basement door ajar but secured by a chain. It appeared to him that the alarm had been triggered by someone pulling open the basement door. He relayed these facts to the dispatcher and then continued his search for the described suspicious vehicle.

In the course of his search for the vehicle in question, Bruno saw two women sitting on the front steps of a house. He

engaged the women in conversation and explained that he was searching for a vehicle, which he described to them. One of the women, who also identified herself by name, told Bruno that she had seen the described vehicle. According to this woman, the vehicle, with two men inside, had parked near her home about an hour earlier. She also informed Bruno that she saw two men step out of the car and walk along the street, looking into the yards of various houses as they did so. She described the men as being tall, Caucasian, about twenty-five to forty years of age, and sloppily dressed in jeans, tee-shirts with logos that she could not identify, and baseball hats.

Bruno drove away in the direction indicated by the woman. He eventually came upon the vehicle in question. It was parked on the opposite side of the street, facing toward Bruno. As he drove by the car, he noted that there was a person in the front passenger seat. After Bruno passed the car, he looked into his rearview mirror and saw a person run from the side yard of a nearby house and jump into the driver's seat of the car. Bruno reversed his direction and called for assistance on his police radio.

The car was stopped at a traffic light when Bruno caught up to it. He activated his lights and siren, and the driver pulled the car over. Standing behind the driver's door of his cruiser, Bruno shouted for the occupants of the car to turn off its motor and keep their hands in the air. As he did so, he saw the passenger, later identified as the defendant, immediately begin to make movements as if he were shoving something under the seat or "fooling with something on the floor of the motor vehicle." Upon seeing the defendant's movements, Bruno shouted that he wanted "to see hands" and drew his weapon.[1] The occupants of the vehicle raised their hands, and the driver dropped the keys

---

[1] The judge found that Bruno got out of his cruiser with his gun in hand. However, the transcript clearly documents that Bruno testified that he drew his weapon only after he saw the defendant "fooling" with something beneath the passenger seat. As there is nothing in either the evidence to show that Bruno alighted his cruiser with a drawn gun or the judge's findings to show that he discredited Bruno's testimony, we attribute the judge's finding to an inadvertent displacing of the sequence of the many events that had occurred and accept Bruno's uncontradicted testimony concerning the point at which he drew his weapon.

to the car out his window. In the meantime, other officers, including Ward and Finn, had arrived at the scene.

The following events occurred in such rapid succession as to be simultaneous. With the assistance of officers Ward and Finn, Bruno removed the driver, Michael Lava, and the defendant from the car. The two men were placed face-down on the ground, handcuffed, and frisked. As Bruno was attempting to control an agitated Lava, Ward's frisk of the defendant produced a can of pepper spray and a woman's watch. The defendant readily explained that although he had no license to carry the pepper spray, it belonged to his girlfriend and not him.

As Bruno stood watch over Lava, he heard Ward advise the defendant of his Miranda rights after which Ward told Bruno that the defendant had agreed to go with him, Ward, to the houses that he admitted that he and Lava had earlier burglarized. As Bruno watched Ward and the defendant leave the scene, Lava became angry, "lost it," jumped up, and tried to flee. Bruno restrained and arrested him for disorderly conduct.

Based upon his earlier observations of the defendant's furtive gestures, his information concerning the criminal history of Lava, and Lava's reaction to the defendant's statements to Ward and his departure from the scene with him, Bruno, acting out of safety concerns, went to the open passenger door of the vehicle and looked beneath the seat. There he found gloves, a cap, and a "baggie with yellow jewelry in it" which contained eighteen gold chains and bracelets.

It is on the basis of these findings that the judge concluded that although the officers had reasonable suspicion to stop the car and make reasonable inquiry of its passengers, their actions were so intrusive and disproportionate to their need to make inquiry of the men as to constitute an arrest without probable cause. He allowed the defendant's motion, suppressing the use of the items seized and the defendant's statements as evidence against him.

2. *Discussion.* It is well-established that while a judge's detailed and comprehensive findings of fact are beyond challenge, we may nonetheless substitute our judgment for the judge's on the ultimate findings and conclusions of law on the

issues of constitutional proportions raised on this appeal. See *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980).

While the detention of Lava and the defendant was unquestionably a "seizure" involving a degree of force greater than that usually involved in a *Terry*-type stop, see *Terry* v. *Ohio*, 392 U.S. 1 (1968), we conclude that in the circumstances presented, the actions of Bruno and his fellow officers were reasonable. See *Commonwealth* v. *Fitzgibbons*, 23 Mass. App. Ct. 301, 304-309 (1986); *Commonwealth* v. *Andrews*, 34 Mass. App. Ct. 324, 328-330 (1993). In our view, they had ample justification for stopping and blocking the vehicle, ordering Lava and the defendant out of the car, frisking them for weapons, restricting their movements, and transporting the defendant, who had been advised of his Miranda rights, to the various scenes of his admitted burglaries. See *Commonwealth* v. *Williams*, 422 Mass. 111, 118 (1996); *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 106 (1997).

The question next becomes whether Bruno could enter the vehicle and reach beneath the passenger seat after Ward drove off with the defendant and after the handcuffed Lava, who had jumped up and attempted to flee, had been arrested for disorderly conduct. Bruno stated that he searched beneath the passenger seat out of concern for his safety.

We will assume for purposes of decision that Bruno's safety concerns at this time were minimal at best. Our assumption does not invalidate his seizure of the evidence in question. In our view, there was ample probable cause to arrest Lava at this time for violation of G. L. c. 266, § 18, that is, breaking and entering a dwelling house in the daytime with the intent to commit a felony. As stated in *Commonwealth* v. *Williams*, 422 Mass. at 119 n.11:

> "Probable cause to arrest exists where the facts and circumstances in the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in believing that an offense has been or is being committed."

Based upon *Commonwealth* v. *Murdough*, 44 Mass. App. Ct. 736, 740 (1998), we also conclude that it makes no difference

in our analysis that Bruno had placed Lava under arrest as a disorderly person. There the court stated:

> "The [United States] Supreme Court has 'never held, outside the context of inventory search or administrative inspection . . . that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but [it has] repeatedly held and asserted the contrary.' *Whren* v. *United States*, 517 U.S. 806, 812 (1996). Compare *Commonwealth* v. *Santana*, 420 Mass. 205, 209 (1995). See Smith, Criminal Practice and Procedure § 240, at 177 (2d ed. 1983); LaFave, Search and Seizure § 1.4(e), at 115 (3d ed. 1996)."

See also *Commonwealth* v. *Murdough*, 428 Mass. 760, 765 (1999), stating that *Whren* teaches that "if the objective circumstances justify the action taken, that is enough."

Nor do the facts that Lava was handcuffed and the defendant removed from the scene before Bruno looked beneath the passenger seat invalidate any search conducted incident to an arrest based upon probable cause. See *Commonwealth* v. *Netto*, 438 Mass. 686, 696 (2003), decided subsequent to the judge's decision.

3. *Conclusion.* It follows from we have said that the evidence and statements procured by the police should not have been suppressed. Accordingly, the judge's order allowing the motion to suppress is reversed, and the matter is remanded to the Superior Court for further proceedings.

*So ordered.*