Wrenn, Daniel M., J.
Each of the three defendants in this matter have been indicted on a single charge of trafficking heroin 100 to 200 grams, c. 94C, §32E(c). The defendant Luis Rivera is also charged with possession of heroin with intent to distribute, c. 94C, §32(a)(b). The defendants have moved to suppress all evidence and statements obtained during the course of a November 18, 2012 traffic stop on Route 20 in Sturbridge. This motion was the subject of a hearing on March 6, 2014 at which time the Courtheard testimony from Sturbridge Police Sergeant Earl Dessert and Auburn Police Officer James Ljundgren. In addition entered into evidence were a copy of the Motor Vehicle Citation issued to the defendant Raul Morales-Reyes as well as a copy of the records of Sergeant Dessert’s Database Query on the November 18, 2012 date along with a copy of a transcript of the Turret Tape for that date and the Southbridge Police Department Dispatch Log. Upon consideration of the credible testimony provided and the exhibits along with the written submission by all counsel, the defendants’ motion to suppress is ALLOWED.
FACTS
I make the following findings of fact based on the credible evidence presented at the hearing. The first witness to testify was Sturbridge Police Sergeant Earl Dessert. I find that Sergeant Dessert was a credible witness and I credit his testimony in most respects for the purposes of the present motion except as set forth below. Sergeant Dessert is a police officer with sixteen years experience with the last six years being spent with the Sturbridge Police Department. Sergeant Dessert presents as a well trained and experienced officer who has had additional specialized training in narcotic identification and investigation.
Sergeant Dessert on November 18,2012 at some point during his shift was stationed at the Village Laundromat located off Route 20 in Sturbridge. At that time Sergeant Dessert was fully uniformed and in a marked cruiser.
Sergeant Dessert observed a Chrysler minivan traveling toward him on Route 20 and based on his knowledge, training and experience as a police officer estimated that the van was traveling between 50 to 55 miles per hour. The posted speed limit in this area was 35 miles per hour and once the van passed the officer’s location he pulled his cruiser out and paced the *189 minivan. This pacing involved his clocking the speed of the minivan utilizing equipment associated with his cruiser which pacing occurred over a three-quarter to one-mile distance. Sergeant Dessert during that time established that the minivan was traveling between 42 to 45 miles per hour. This initially was in a 35-mile per hour posted area and later during the pacing was in an area that was posted-for 30 miles per hour.
Sergeant Dessert based on his observation and conclusion that the minivan was speeding initiated a stop of the minivan by activating his emergency lights. The minivan was not being operated in any type of erratic manner, was operated completely within its marked lanes and once the emergency lights were activated the minivan pulled to the side of the road without incident. Sergeant Dessert, when he pulled the vehicle over, called the stop into his dispatch.
Sergeant Dessert approached the vehicle on its passenger side and as he walked outside of the vehicle noticed a strong odor of air freshener. The passenger in the vehicle immediately rolled down the window and Sergeant Dessert testified that he had a “overwhelming” odor of air freshener once the window was rolled down. Sergeant Dessert noted that the vehicle had three individuals within it those being the operator, the defendant, Raul Morales-Reyes (Reyes), the front seat passenger the defendant Luis Rivera (Rivera), and the rear seat passenger defendant Omar Diaz-Palmers (Palmers).
Sergeant Dessert engaged the vehicle occupants in conversation and learned that the driver did not speak English thus Sergeant Dessert utilized Rivera to serve as a makeshift inteipreter to communicate with Reyes. Sergeant Dessert engaged in several minutes of conversation with Reyes through Rivera with Reyes ultimately producing a valid driver’s license and a valid registration for the minivan. In addition, Sergeant Dessert learned that the group had come from Palmer, Massachusetts and were traveling to Fitchburg and that the occupants of the vehicle came from Queens, New York, Lawrence and Fitchburg. In addition, Sergeant Dessert noted that the vehicle was being operated via a single key that was in the ignition and also noted that there was some confusion on the part of the driver as to the proper name of the vehicle owner and as to the three passengers there was confusion over the names of the passengers amongst themselves. However, during the entirety of the interaction, all three passengers remained calm, there were no furtive movements within the vehicle and the three defendants were completely cooperative and compliant during this encounter. In addition, Sergeant Dessert based on his training observed the interior of the vehicle during this encounter looking for any suspicious items and/or activities and saw nothing suspicious.
Once Sergeant Dessert had completed his encounter with the three individuals he obtained the driver’s license of Mr. Reyes as well as identification from the two passengers and also secured the vehicle registration. Sergeant Dessert then went back to his cruiser to verify this information. Sergeant Dessert at that time decided that he was going to search the vehicle for drugs since he felt that there was reasonable suspicion. At that time he believed there was drug-related activity associated with these three individuals and the vehicle. Specifically, Sergeant Dessert relied on the strong odor of air freshener, the single key in the ignition, the use of a third-party vehicle, the uncertainty of the name of the vehicle owner and the fact that there was uncertainty among the three individuals as to their respective names, that is the three individuals did not appear to know each other. Finally, Sergeant Dessert noted that the three individuals came from areas that according to Sergeant Dessert’s training were high drug and/or narcotic geographic areas.
When Sergeant Dessert ran the information on the individuals and the vehicle they all came back clean. That is, there were no outstanding warrants on any of the vehicle occupants and the registration for the vehicle was a valid registration with no reports of any stolen vehicle and there were no issues regarding Reyes’ driver’s license nor any other issues as to any of the three occupants such as any BOLOs or related items. At that time, Sergeant Dessert also put out a call to several areas and ultimately located a K-9 officer available to the Auburn Police Department. Sergeant Dessert had a private cell phone to cell phone conversation with the Auburn Officer and arrangements were made for the Auburn Officer with the K-9 to come to this stop in order to conduct further investigation. Sergeant Dessert indicated that at that time he was intending to do a 94C search that is a search for drugs.
Sergeant Dessert then returned to the minivan by which time other officers had arrived on the scene. Sergeant Dessert removed the three individuals from the vehicle, placed them in handcuffs and then placed them in the rear of three separate cruisers.[1] Sergeant Dessert then waited for the K-9 Unit to arrive after which a step-by-step search of the vehicle was undertaken with the first encounter being an exterior sniff of the vehicle by the K-9. Ultimately the search yielded a saran wrapped block of heroin that was concealed within the vehicle in an aftermarket hide.
As discussed earlier the Court credits Sergeant Dessert as generally credible in the factual information that he provided. However, in regard to Sergeant Dessert’s opinion regarding the indicia of drug activity associated with this stop namely the odor of air freshener, the use of a single key in the ignition, the lack of specific information regarding the vehicle owner and the names of the individuals occupying the vehicle as well as the information regarding the residence of the defendants being “source” drug communities the Court does not credit that opinion by Sergeant Dessert. Instead, the Court finds that Sergeant Dessert’s information provided nothing more than a hunch on his part that this stop involved a vehicle that was transporting narcotics and the information available *190 to him did not rise to the level of reasonable suspicion of drug-related activities but again with merely an educated guess or hunch on his part not supported by specific articulable facts to justify that hunch.
The time involved between the police and the defendants to complete this encounter was about an hour and a half to an hour and forty-five minutes with the vehicle being at the side of the road that entire time. In addition, once Sergeant Dessert removed the defendants from the vehicle Sergeant Dessert was conducting a drug investigation.
The second witness to testify was Auburn Police Officer James Ljundgren. Officer Ljundgren has been a police officer for twenty-six years and presently is working for the Auburn Police Department. Sergeant Ljundgren is assigned to the K-9 Unit and as of November of 2012, was working with a narcotics trained dog named Axel. The officer and the dog had extensive and appropriate training as well as extensive and appropriate experience in narcotics-related investigations and activities. Officer Ljundgren and Axel had worked together about three years prior to this encounter and during that time had gone to ongoing and appropriate training on narcotics-related smells and investigations.
Officer Ljundgren went through in detail the investigation undertaken by he and Axel starting with the exterior sniff of the vehicle which resulted in an “alert” by Axel. That alert led to an interior sniff of the vehicle which produced a second “alert.” Based on that information, Officer Ljundgren who has extensive training in searching for and locating after market hides in vehicles went through a detailed search utilizing secondary instruments which resulted in Officer Ljundgren locating an electric powered hide in the minivan. Once power was supplied to that device within the vehicle, the hide was located and the subject heroin was uncovered. The Court credits Officer Ljundgren’s testimony in all respects relative to the issues involved in the subject motion. Specifically, Officer Ljundgren’s training and experience is appropriate as is the training and experience of his canine for purposes of the investigation and activities undertaken during this roadside investigation.
DISCUSSION
Sergeant Dessert had a proper reason to pull over the subject minivan. Specifically, Sergeant Dessert an officer with many years experience, utilizing appropriate equipment contained within his cruiser made observations and determinations that the defendant’s vehicle was traveling at a speed in excess of the posted speed limit which observations were made over the course of three quarters to one mile. Those observations and conclusions evidenced a civil traffic violation such that Sergeant Dessert had an appropriate reason to stop the minivan for that traffic-related violation. Commonwealth v. Bacon, 381 Mass. 642 (1980).
Once the vehicle was stopped, however, the scope of the officer’s inquiiy must be analyzed and the nature of the stop involved will define the scope of the initial inquiiy. Commonwealth v. Bartlett, 31 Mass. Appeals Ct. 468 (1996). An inquiiy after a stop for a traffic offense should “pertain to the operation of the motor vehicle. If the driver produces a valid license and registration, there is ordinarily no reason for an officer to probe further. The officer should give the driver a citation for the traffic offense and then permit the vehicle to proceed on its way.” Id. at 470-71. In this context, however, the officer is not required to ignore what he sees, smells or hears and may'inquire further based on those observations. Id. at 471. The length of the encounter, the nature of the inquiiy, the possibility of flight, and the danger to the safety of the involved officers are all factors that must be considered in determining whether the scope of the inquiiy was justified. Commonwealth v. Williams, 422 Mass. 111, 118 (1996).
In the present factual circumstances Sergeant Dessert had no safety concerns and therefore his exit order needed to be based on specific articulable facts and reasonable inferences that the defendant or defendants had committed, was committing or was about to commit a crime. Commonwealth v. Willis, 415 Mass. 814, 817. In viewing this situation the court must assess the reasonableness of Sergeant Dessert’s conduct by viewing the facts and circumstances in their entirety. Commonwealth v. Williams, 422 Mass. 111, 116 (1996). In the present case factually Sergeant Dessert did not have specific, articulable facts viewed in their entirety which would warrant an exit order. Sergeant Dessert had smelled a strong odor of air freshener, noted a single key in the ignition of the vehicle and had some conflicting information regarding the three individuals’ knowledge of certain information regarding the occupants of the vehicle and the owner of the vehicle. In its totality this is not enough to give rise to a reasonable suspicion of some type of criminal activity or conduct. The sergeant was acting on nothing more than a hunch which basis does not pass constitutional muster. See, Commonwealth v. Gonzalez, and Commonwealth v. Cruz, 459 Mass. 459, 476-77 (2003).
Based on the above factual findings and analysis the police had no right to search the minivan and therefore all evidence seized as a result of the subsequent search of the vehicle and all statements by the defendants subsequent to the exit order are required to be suppressed.
CONCLUSION
Based on the above Court findings, discussion and analysis the Defendants’ Motion to Suppress Evidence and Statements is ALLOWED and all items obtained during the search of the subject minivan and all statements by the defendants subsequent to the exit order are SUPPRESSED and EXCLUDED.

Contrary to Sergeant Dessert’s statement the defendants were in custody and under arrest at this time. The defendants were not free to leave and any reasonable person at this time would believe they were in custody.