COMMONWEALTH *vs.* MICHAEL L. WATSON
(and three companion cases[1]).

Suffolk. October 5, 1999. - February 8, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, & IRELAND, JJ.

*Threshold Police Inquiry. Constitutional Law,* Search and seizure, Probable
cause. *Search and Seizure,* Threshold police inquiry, Automobile, Probable
cause, Container, Plain view, Warrant, Affidavit. *Controlled Substances.*
*Probable Cause.*

Police officers had reasonable suspicion to justify their stop of a vehicle to
conduct a threshold inquiry [729-731], and where the detention of the
driver and passenger was brief, it did not amount to a seizure of them
[731-733]; further, after making an inquiry, the officers had probable cause
under the automobile exception to the warrant requirement to seize two
suitcases in plain view in the vehicle and hold them until a drug detection
canine arrived [733-734].

The record of a criminal proceeding supported the judge's conclusion that
police officers' search of two lawfully seized suitcases was carried out after
a search warrant was obtained. [734]

Certification of a drug detection canine is not a requirement to establish prob-
able cause in an application for a warrant to open and search the containers
to which the dog has reacted positively. [734-735]

Information in an affidavit in support of a search warrant was sufficient to
establish probable cause for the warrant to issue. [735]

INDICTMENTS found and returned in the Superior Court Depart-
ment on July 27, 1995.

Pretrial motions to suppress evidence were heard by *Peter M.
Lauriat,* J., and the cases were heard by *Carol S. Ball,* J., and
*Regina L. Quinlan,* J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Steven M. Lundbohm & Francis J. Hurley* for Michael L.
Watson.

*Alan D. Tuttman* for Thomas J. Smith.

*Christopher Pohl,* Assistant District Attorney, for the Com-
monwealth.

---

[1]Two against Thomas J. Smith and one against Michael L. Watson.

LYNCH, J. The two defendants, Michael L. Watson and Thomas J. Smith, were convicted, in separate jury-waived trials, of trafficking in marijuana and conspiracy to violate the controlled substances laws.[2] The execution of sentences of one year each was stayed pending their appeals from the denial of their motions to suppress evidence seized from two suitcases in Watson's vehicle. We transferred the cases here on our own motion, and we now affirm.

The defendants argue that the motion judge erred in denying their motions to suppress under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights for several reasons:[3] (1) there was no reasonable suspicion to justify a stop (*Terry* v. *Ohio*, 392 U.S. 1 [1968]) of the defendants and seizure of their property, (2) even if there was reasonable suspicion to justify a *Terry* stop, detention of the defendants and their property was excessive, (3) because the detention was excessive, the State police lacked probable cause to seize either the defendants or their property, (4) there was a warrantless search of the property, and (5) the warrant itself was invalid. The defendants further assert that art. 14 should offer more protection than the Fourth Amendment during a *Terry* stop.[4]

1. *Facts.*[5] Troopers Mark E. Archer and Carol Harding were trained and experienced in narcotics investigations and had received specialized training in hotel drug interdiction. As part of the specialized training, the troopers learned that individuals involved in illegal drug activities used hotels near airports, and that there were several indicators of their activity including arriving from certain States known as sources of high drug activity, paying cash for a room, having an indeterminate length of stay with no advance reservations, using public or cellular

---

[2]While tried separately before different Superior Court judges, a third judge had conducted a single hearing on the defendants' motions to suppress.

[3]In the interest of efficiency, where the defendants make similar arguments, we have combined them without distinguishing between them.

[4]The Commonwealth argues that the defendants do not have standing to contest the propriety of the search of the suitcases because the defendants denied ownership. However, a defendant who is charged with possession has automatic standing to contest the propriety of an automobile search under the Massachusetts Declaration of Rights. See *Commonwealth* v. *Amendola*, 406 Mass. 592, 601 & n.4 (1990).

[5]We supplement the facts found by the motion judge with uncontroverted testimony of the troopers at the hearing on the motions to suppress.

telephones, and carrying "hard-sided" luggage.[6] Trooper Archer met with the managers of hotels located near Logan Airport and enlisted their cooperation in narcotics investigations.

On March 10, 1995, Trooper Archer drove to the Ramada Inn on Route 1A in Revere, north of Logan Airport.[7] He checked the guest registration forms and found John Graneto who had arrived from Encinadas, California, which is near San Diego and approximately thirty miles from the Mexican border. Graneto had paid cash for his room and checked into room 221 at 1:30 A.M. Trooper Archer obtained a photocopy of Graneto's driver's license (providing a photograph of Graneto) and decided to set up a surveillance. He requested that Troopers Harding and Michael Valair and Sergeant Michael Melia join him. Shortly after 8 A.M. Troopers Archer and Harding were in the hotel lobby and Valair and Melia waited in their vehicles in the hotel parking lot.

At approximately 11 A.M., Archer observed an individual resembling Graneto get off the elevator in the lobby, enter the hotel's restaurant, and order a meal. At approximately 11:40 A.M., Graneto left the restaurant and returned to the second floor. Then at noon, Graneto came back into the lobby, gave the front desk clerk cash, and returned to the second floor.

Archer learned from the front desk clerk that Graneto had paid for another day at the hotel.[8] Archer also learned that Graneto had placed two calls to San Diego, California, shortly after his arrival at the hotel.

At approximately 1 P.M., Archer and Harding observed three men enter the hotel lobby through the rear doors. Two were the defendants and the third was later identified as Mark Curran. The three individuals walked over to a bank of telephones and Curran placed a call from a hotel house telephone. The three

[6]The targeted States are California, Arizona, and Texas (important because of their proximity to Mexico), and New Jersey. Hard-sided luggage is preferred because it contains the odor of marijuana. The use of public or cellular telephones prevents the hotel from having a record of the calls. The calls are usually placed "immediately" on arrival at the hotel to indicate that the drug dealer is ready to do business. Because the drug dealer does not know how quickly the drugs will sell, payment is for one night at a time.

[7]The hotel's owners have since changed franchises and the hotel has a different name.

[8]Checkout time was noon. Graneto made a $100 deposit to hold the room for another day. It was refunded when he checked out shortly after the defendants entered his room and removed two suitcases.

individuals then took the elevator to the second floor. Trooper Archer took the stairway and arrived to see the three individuals enter Graneto's room.

Archer returned to the lobby and reported what he had seen to Trooper Harding. Shortly thereafter, Watson and Smith emerged from the elevator in the lobby, each pulling a large, seemingly heavy, suitcase. One suitcase was black nylon and the other was blue and hard-sided. Watson and Smith went through the rear doors of the hotel into the parking lot. At about the same time, Graneto came to the hotel lobby with Curran, checked out, called for a taxi, and left the hotel.[9]

By radio, Archer told Valair, Melia, and Harding, who had gone into the parking lot, that the defendants were leaving by the rear doors. Harding observed the defendants struggle to lift the suitcases into the rear of a red Eagle Talon hatchback-style vehicle. The defendants then left the parking lot and drove onto Route 1A, with the four troopers following in separate, unmarked cruisers.

As he was leaving the hotel parking lot, Archer radioed the Revere State police barracks, asking for marked cruisers to be available to pull over Watson's vehicle if need be. Watson and Smith's vehicle slowed and accelerated along Route 1A, made an abrupt right turn onto the ramp for Route 145, with the troopers following. Archer asked the troopers in marked cruisers to stop Watson and Smith after they made a U-turn on Route 145.[10] Trooper Hubert made the stop.[11]

Trooper Hubert asked Watson, the driver, to produce his license and registration, and Trooper Valair asked him to step to the rear of the vehicle. He asked Watson about the suitcases in the back of the vehicle and Watson replied that they belonged to Smith. Smith was then ordered out of the vehicle. Smith denied ownership of the suitcases.

At that point, Trooper Valair conferred with Trooper Archer and Sergeant Melia, and they decided to seize the suitcases. Watson and Smith were told that they could accompany the

---

[9]Trooper Archer did not recall seeing Graneto with luggage when he checked out.

[10]Drug couriers use erratic driving to find out whether they are being followed. They may make "abrupt turns, or stops . . . [run] traffic lights[, or go] around rotaries several times . . . ."

[11]Ultimately, four unmarked cruisers and two marked cruisers were at the scene of the stop.

suitcases to the State police barracks, but they did not have to do so. The troopers, followed by Watson and Smith, set out at about 1:45 P.M. and drove to the Revere barracks arriving at approximately 2 P.M. Watson and Smith stayed in the lobby awaiting the arrival of a drug detection dog while the suitcases were taken to the office area.

In the meantime, Trooper Valair gave both Watson and Smith their Miranda warnings. The defendants were interviewed separately and each volunteered statements about their activities of the day.[12] Questioning ended when each defendant requested an attorney.

Trooper Rideout arrived with a drug detection dog at approximately 3 P.M. The suitcases were placed in different rooms and the dog reacted positively to both suitcases. Watson and Smith were then arrested. Trooper Harding prepared an affidavit and obtained a warrant and searched the suitcases, which contained marijuana.[13]

2. *Validity of* Terry *stop.* In evaluating the propriety of a *Terry* stop, we inquire whether the initiation of the stop was proper in the circumstances and whether the scope was justified by the circumstances. See *Commonwealth* v. *Silva,* 366 Mass. 402, 405 (1974).

a. *Validity of stop.* An officer has the right to "make a threshold inquiry where suspicious conduct gives the officer reason to suspect that a person has committed, is committing, or is about to commit a crime." *Id.* Reasonable suspicion cannot be based on a hunch or on good faith, but the inferences can follow in light of the officer's experience. See *Commonwealth* v. *Kennedy,* 426 Mass. 703, 710-711 (1998) (even though officer did not see what was exchanged, officer's training, education, and knowledge supported reasonable suspicion of drug deal); *Commonwealth* v. *Silva, supra* at 406. Officers may stop automobiles to conduct a threshold inquiry. *Id.* at 405. Seemingly innocent activities taken together can give rise to reasonable suspicion justifying a threshold inquiry. See *Commonwealth*

---

[12]Watson told Trooper Valair that he had stopped in the Ramada Inn to telephone his girl friend and that he had not been into any rooms in the hotel. After the trooper asked him about the suitcases, Watson said that he stole them. Smith told the trooper that he and Watson went to room 221 but that he, Smith, did not enter the room.

[13]The issue whether the warrant had been executed at the time the suitcases were searched is addressed *infra.*

v. *Alvarado*, 420 Mass. 542, 549 (1995), citing *Terry* v. *Ohio*, 392 U.S. 1 (1968), and cases cited. See *Terry* v. *Ohio, supra* at 22 (series of innocent acts "taken together warranted further investigation"); *Commonwealth* v. *Williams*, 422 Mass. 111, 116 (1996), citing *Commonwealth* v. *Fraser*, 410 Mass. 541, 545 (1991), and *Commonwealth* v. *Thibeau*, 384 Mass. 762, 764 (1981).

In this case, as the motion judge found, the State police officers had more than enough information to establish a reasonable suspicion to justify stopping Watson's vehicle to conduct a threshold inquiry. The troopers knew that Graneto's actions satisfied some of the indicators for a drug dealer. They saw the defendants come in to the hotel with no luggage, enter Graneto's room for a short period of time, and emerge with two heavy suitcases, which they loaded into a vehicle at about the same time that Graneto checked out of the hotel. After the defendants left the hotel parking lot, they drove erratically and evasively, in a manner that the officers could infer was intended to detect whether they were being followed, adding to the suspicion the officers already harbored.

The defendants argue that there was not enough information to establish reasonable suspicion because the factors used to draw the drug courier profile of Graneto were too general.[14] This argument is not applicable to the present case because the

[14]The defendants argue that some of the factors indicating a drug courier did not fit Graneto. For example, one of the suitcases was soft-sided rather than hard-sided and the driver's license that Graneto gave was seemingly valid identification, undercutting the argument that drug dealers want to remain anonymous. However, Trooper Archer indicated that these factors were tendencies, not hard and fast rules. Regarding suitcases, Trooper Harding said, "Hardsided suitcases are *preferred, usually* . . . ." Regarding identification, the trooper said that the person might "*possibly*" be reluctant to give proper identification after paying cash." (Emphasis added.) Furthermore, relying on *Commonwealth* v. *Kaufman*, 381 Mass. 301 (1980), the defendants argue that, because carrying suitcases is consistent with innocent activity, simply seeing someone with a suitcase is not enough to create reasonable suspicion. *Kaufman* is not on point because the court concluded that plastic bags " 'consistent' in size and shape with bags commonly used to transport large amounts of marihuana," *id.* at 304, in addition to information that Kaufman associated with drug dealers and had large amounts of cash, were insufficient to establish *probable cause* to issue a search warrant. *Id.* at 302. Unlike *Kaufman*, the issue in this case is the degree of information necessary to establish *reasonable suspicion*. Simple possession of suitcases was not the sole ground for that suspicion. The troopers also took note of Graneto's actions as well as the defendants' entering Graneto's room and emerging with luggage.

focus of the officers' suspicions leading to the stop was on the defendants, not Graneto. The fact that the defendants were interacting with someone who was under surveillance as a possible drug courier, coupled with the fact that they arrived at a hotel without luggage and emerged shortly thereafter from Graneto's room with two heavy suitcases, which they placed in a vehicle not connected with Graneto, and then drove in a manner which would permit them to detect whether they were under surveillance, was enough to establish a reasonable suspicion that the defendants had committed a crime.[15]

The defendants also argue that, even if there eventually was reasonable suspicion, the officers did not have reasonable suspicion before pursuit began, as required by law. See *Commonwealth* v. *Stoute*, 422 Mass. 782, 788-789 (1996); *Commonwealth* v. *Thibeau*, *supra* at 764 (reasonable suspicion before pursuit begins). This argument fails because pursuit begins only when action by the police would "communicate[] to the reasonable person an attempt to capture or otherwise intrude on [an individual's] freedom of movement." *Commonwealth* v. *Williams*, 422 Mass. 111, 116 (1996). It occurs when police attempt to stop an individual "to effectuate a threshold inquiry." *Id.* at 117. Following or observing someone without more, such as using a siren or lights, attempting to block or control an individual's path, direction, or speed, or commanding the individual to halt, is not pursuit. *Id.* at 116-117, citing *Michigan* v. *Chesternut*, 486 U.S. 567, 575 (1988).

By the time pursuit commenced, the State troopers had observed the events at the hotel and Watson's distinctive method of driving. This was more than enough to create a reasonable suspicion.

b. *Scope of investigatory stop.* The defendants argue that, once the police had obtained a valid license and registration from Watson, there was no basis for further investigation, and that their further detention was a seizure requiring probable cause. The defendants were not seized within the meaning of the Fourth Amendment. A seizure occurs when a reasonable

---

[15]We need not reach the significance of drug courier profiling under art. 14. See *United States* v. *Sokolow*, 490 U.S. 1, 10 (1989) (drug profiling can be relied on by trained drug enforcement agents to justify reasonable suspicion). But see *Reid* v. *Georgia*, 448 U.S. 438, 441 (1980) (per curiam) (cannot use facts that "describe a very large category of innocent travelers" to justify reasonable suspicion).

person would believe that he was not free to leave. See *Commonwealth* v. *Fraser*, 410 Mass. 541, 543 (1991), quoting *United States* v. *Mendenhall*, 446 U.S. 544, 554 (1980). "The pertinent inquiry is whether the degree of intrusion is reasonable in the circumstances. The degree of intrusiveness . . . is that which is 'proportional to the degree of suspicion that prompted the intrusion.' " *Commonwealth* v. *Moses*, 408 Mass. 136, 141 (1990), quoting *Commonwealth* v. *Borges*, 395 Mass. 788, 794 (1985). Officers may order occupants out of an automobile for questioning as a precaution if they have specific and articulable facts to show there might be a danger to the officer. See *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 663 (1999). Once an officer receives a driver's license and registration, there is no basis for further interrogation, and there must be a valid purpose to order an individual to leave his vehicle. See *Commonwealth* v. *Ferrara*, 376 Mass. 502, 504-505 (1978). However, such an order that precedes a threshold inquiry, as long as it is reasonable, is valid. See *Commonwealth* v. *Loughlin*, 385 Mass. 60, 62-63 & n.3 (1982).

The motion judge found that, in the circumstances, the detention of the defendants was brief and did not amount to a seizure. Here, the purpose of the stop was to conduct a threshold inquiry concerning the suitcases. The inquiry did not end when Watson produced his license and registration. In keeping with *Commonwealth* v. *Loughlin*, *supra*, it was proper to order Watson out of the automobile before conducting the threshold inquiry about the suitcases. When Watson said that the suitcases belonged to Smith, it was reasonable to order Smith out of the vehicle and to ask him about the suitcases.[16] When Smith denied ownership of the suitcases, it was reasonable for the officers to decide to seize them.[17] The troopers told Smith and Watson that the suitcases were being taken to the Revere State police bar-

---

[16]In his brief, Watson argues that his person was searched at the scene and his keys were taken. Nothing in the record supports his claim that his keys were taken. However, if his keys were taken, the taking of the keys, in and of itself, does "not change [an] investigative stop into an arrest." *Commonwealth* v. *Moses*, 408 Mass. 136, 141 (1990). Moreover, there is no finding that he was subject to a pat down search, but, even if he was, such a search is valid if an "officer has reason to believe he is dealing with an armed and dangerous person." *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 666 (1999), citing *Terry* v. *Ohio*, 392 U.S. 1, 24-25 (1968).

[17]The fact that the defendants may have automatic standing to contest the seizure of the bags, *Commonwealth* v. *Amendola*, 406 Mass. 592, 601 (1990),

racks and that, if they did not want to, they did not have to follow. At no time did the troopers draw their guns or threaten the defendants in any way.

Furthermore, there is no merit to the defendants' argument that the seizure of the suitcases further detained them, given that, at the moment the suitcases were seized, both defendants denied ownership, and voluntarily followed the police to the barracks in Watson's vehicle. Only about forty-five minutes elapsed from the time the troopers saw Watson, Smith, and Curran enter the hotel and make a telephone call to Graneto's room, until the troopers left with the suitcases in their possession. The detention of the defendants did not amount to a seizure.

Regarding the two suitcases, the defendants request that we conclude that art. 14 requires that the police have probable cause rather than reasonable suspicion when seizing personal property during a *Terry* stop. In this case, there was probable cause to seize the suitcases under the automobile exception to the warrant requirement of the Fourth Amendment.[18] Under the automobile exception to the Fourth Amendment and art. 14, a police officer may search a vehicle once there is probable cause to believe that a vehicle contains contraband and the officer may search even closed containers if the situation is "exigent so as to render obtaining a warrant impracticable." *Commonwealth* v. *Wunder*, 407 Mass. 909, 913 (1990). See *Commonwealth* v. *King*, 389 Mass. 233, 246-247 (1983) (exigent circumstances justified warrantless search of even closed containers). Probable cause exists when the police have sufficient information to justify a reasonable person's belief that the defendant has committed or is committing a crime. See *Commonwealth* v. *Wunder, supra* at 912. In determining whether the police think that the automobile contains contraband, they may rely on their own observations that take on "special significance" to their "trained" eyes. *Commonwealth* v. *Cast*, 407 Mass. 891, 900 (1990). Once the defendants had been stopped, it was not unlawful to see things in plain view. See *Commonwealth* v. *Wilson*, 360 Mass. 557, 560 (1971). Further-

does not prevent the officers from considering the implausibility of the explanation offered by the defendants.

[18]In ruling on the defendants' motions to suppress, the motion judge analyzed this issue under the standards of reasonable suspicion set out by the United States Supreme Court in *United States* v. *Place*, 462 U.S. 696 (1983).

more, "[i]mplausible answers to police questions will, with other facts, support a finding of probable cause to conduct a search . . . ." *Commonwealth* v. *Riggins*, 366 Mass. 81, 88 (1974), and cases cited. See *Commonwealth* v. *Wilson, supra* at 559-560 (defendant's response, when police saw water pistol in his automobile, that he did not know where it came from and then saying that it probably belonged to his nephew are "incredible" answers justifying further inquiry).

In this case, the police had reasonable suspicion before they even stopped Watson's automobile. When asked about the suitcases, Watson told the police that they belonged to Smith and then Smith said that he did not know who owned them. Such implausible answers coupled with the observations the police already had made about their activity satisfied probable cause to believe the suitcases contained contraband. The police, therefore, were acting with restraint in taking the suitcases to the barracks, calling in a drug detection dog, and obtaining a warrant before opening the suitcases. Given that the police had probable cause to seize the suitcases, the defendants' arguments about art. 14 requiring probable cause to seize property during a *Terry* stop is moot.

In the circumstances of this case, it is reasonable to conclude that the detention of the suitcases until the drug detection dog could arrive was not unreasonable. The police were involved in active surveillance of the defendants and they sent for the dog immediately on their return to the barracks. The dog arrived within an hour.

3. *Warrantless search.* The defendants claim that the search of the suitcases was carried out before a valid warrant was issued. The motion judge's finding recites that the search was carried out at "about" 6 P.M. The judge also found that "the suitcases were opened pursuant to the search warrant," and the record supports the finding that the search was carried out after the warrant was obtained. We accept the motion judge's findings absent clear error. See *Commonwealth* v. *Nieves*, 429 Mass. 763, 768-769 n.5 (1999); *Commonwealth* v. *Wedderburn*, 36 Mass. App. Ct. 558, 558-559 (1994).

4. *Validity of warrant.* Smith in particular challenges the validity of the search warrant itself on two grounds. First, he states that the affidavit Trooper Harding prepared to obtain the warrant did not contain a certification of the drug detection dog. Smith maintains that this omission made the warrant facially

deficient so that the magistrate could not have found probable cause to issue the warrant. Second, he claims, in essence, that the drug detection dog reacted positively to only one suitcase for marijuana and that the warrant should have been issued for only that particular suitcase. Both arguments lack merit.

Under G. L. c. 276, § 2B, an affidavit has to "contain the facts, information, circumstances upon which [the person seeking the warrant] relies to establish sufficient grounds for the issuance of the warrant." Certification of the dog was not necessary to establish probable cause for a search warrant. See *Commonwealth* v. *Welch,* 420 Mass. 646, 655 (1995) (probable cause despite failure to attach drug detection dog's official certification). "In reviewing a finding of probable cause, only the facts revealed on the face of the affidavit and any reasonable inferences therefrom may be considered." *Id.,* quoting *Commonwealth* v. *Allen,* 406 Mass. 575, 578 (1990). "To determine whether an affidavit is sufficient, it should be read in a commonsense, not hypertechnical manner." *Commonwealth* v. *Welch, supra,* quoting *Commonwealth* v. *Truax,* 397 Mass. 174, 180 (1986).

Here the motion judge found that the information that Trooper Harding provided in the affidavit, including the fact Trooper Rideout was an experienced K-9 officer, and that the dog was certified, had conducted more than 200 searches, and had reacted positively to both suitcases at issue, was sufficient to establish probable cause.[19]

Smith's argument that the warrant should have been issued for only one suitcase is based on a distortion of the record. The affidavit Trooper Harding signed clearly states that the drug detection dog reacted positively to both suitcases, *and* that the dog's handler, Trooper Rideout, thought that the dog's reaction to one of the suitcases indicated that it contained marijuana. There is no doubt that there was evidence in the record that the dog reacted to narcotics in both suitcases.

The denial of the motions to suppress is affirmed.

*So ordered.*

---

[19]Trooper Harding's affidavit did contain one error. It identified the dog's name incorrectly as "Maxie" rather than "Roxy." We agree with the motion judge that such a factual inaccuracy should not destroy probable cause because it does not go "to the integrity of the affidavit." *Commonwealth* v. *Murray,* 359 Mass. 541, 548 (1971).