Agnes, A.J.
The defendants are each charged in separate indictments with armed robbery while masked. They have filed pretrial motions to suppress evidence seized from a vehicle in which they were riding. Based on the credible evidence presented at the hearing on their motion to suppress, I make the following findings of fact, rulings of law and order.
FINDINGS OF FACT
On August 1,2001, State Police Trooper McNeil was working the 11:00 p.m. to 7:30 a.m. shift in a marked state police cruiser. He was in uniform and was conspicuously displaying his badge. At some point during his patrol he made an observation of a white Mitsubishi automobile traveling in the opposite direction over the Lawrence Central Bridge. Trooper McNeil’s suspicions were aroused because he believed the driver “was pretending not to see him” and a back passenger stared at him in an “abnormal” way. It was later determined that defendant Rentas was the driver and defendant Morillo was a front seat passenger.[1] Based on these observations and a hunch that something was amiss, Trooper McNeil turned his cruiser around and began to follow the white automobile. Trooper McNeil did not activate his cruiser’s lights or otherwise initiate any outward show of authority or control over the white automobile. He caught up with the white automobile at the intersection of Parker and School Street. The white vehicle took a left turn onto Salem Street. Trooper McNeil’s suspicions were heightened because he believed the occupants of the white vehicle “were paying too much attention to me.” Trooper McNeil did a registration check and learned that the white automobile was registered to a female party who lived in the Hancock Housing Project. He knew that this location was an area in which there was a high incidence of automobile thefts and a place where motor vehicles were often stripped and dumped. He surmised that based on the route taken by the white automobile, it could have been coming from the Hancock Project.
Trooper McNeil decided to take a different route in an effort to get ahead of the white vehicle. Eventually, Trooper McNeil observed the white vehicle pull into the parking lot of a Store 24. This particular convenience store is at the center of a six-way intersection and has two separate parking areas. The lot in question is adjacent to Exeter Street and is depicted in a series of photographs that were admitted into evidence (exhibits 1 -6 and 8). The critical factual dispute in this case concerns which of several parking spaces the white automobile pulled into. There are three possibilities as indicated in exhibit 2. At the hearing before me, Trooper McNeil testified that the white vehicle parked in “the third spot from the left.”[2] This is indicated by the numeral “3" on exhibit 2. Trooper McNeil acknowledged that he had testified at an earlier Probable Cause Hearing in this case that the white vehicle was parked in the last spot on the left (exhibit 2, parking space marked “1”). Trooper McNeil testified at the hearing before me that he revisited the scene and decided after looking it over that his original testimony was not correct and that the white car had actually been parked in ’’the third spot from the left." After the white car pulled into the Exeter Street parking lot, Trooper McNeil pulled his cruiser into the same lot and positioned it at an angle of 30-45 degrees in relation to the white car. He testified before me that the front of his cruiser was 3-4 feet away from the white car and that it was not blocking the white car from exiting. He acknowledged that in his earlier testimony he stated that the distance between the two cars was about three feet, and that if the white car was in the location that he described in his testimony before the Probable Cause hearing it would have been blocked in by the police cruiser.
There was also testimony from Lawrence Police officer DeSantis. He arrived at the scene to assist Trooper McNeil. When he arrived, he saw the car occupied by the defendants and the state police cruiser in the Exeter Street lot. He testified, consistent with Trooper McNeil’s testimony at the hearing, that the white vehicle was parked in “the third spot from the left.” However, he also acknowledged that at the earlier Probable Cause hearing, he testified that the white vehicle was parked [o]n the Exeter Street side, about the second parking spot in, facing the store." A transcript of his testimony was admitted as an exhibit. Exhibit 7 at 77.
Defendant Morillo exited the front passenger seat and entered the Store 24. Trooper McNeil then drove his vehicle into the same parking lot and parked it at an angle toward the white vehicle. He exited his vehicle and approached the white vehicle. He walked over to the driver’s side door and spoke to defendant Rentas. Trooper McNeil asked him who was the owner of the car and to produce a license and registration. The *530 operator did not respond, but he did produce a license. At the same time, the operator leaned forward. As Trooper McNeil looked around the operator he noticed what appeared to him to be a semi-automatic handgun, silver in color, on the floor in the front passenger seat area.
At this point, Trooper McNeil, while holding the license given over by defendant Rentas, took three steps back and drew his own gun. He ordered defendant Rentas to step out of the car and to lie face down on the ground. He placed him in handcuffs. Trooper McNeil ordered the backseat passenger to put his hands up on the seat where they would be visible. He removed the weapon from the front seat and discovered it was a pellet gun. The backseat passenger was then removed from the vehicle and pat frisked.
Trooper McNeil conducted a search of the backseat area of the white vehicle. Balled up inside of a knit hat was a double-edged knife and some jeweliy. A pager also was found. In the glove box, he found a two-way radio.
Based on the discovery of these items, Trooper McNeil contacted the Lawrence Police department to determine if there were any reports of robberies in the area. He learned that a cab driver had been robbed. At this point, officer DeSantis of the Lawrence Police Department arrived' Oil the scene. Trooper McNeil discovered that the radio had been stolen from a cab driver.
At some point, defendant Morillo was removed from inside the Store 24 and placed under arrest. He was advised of his Miranda rights at the scene, and stated that he understood his rights. Defendant Morillo told the police that “only three of us robbed the cab.” The police also arrested defendant Rentas and defendant Tavares. Following an inventory search of the white vehicle, it was towed to the police station.
Based on a consideration of the in court testimony of the witnesses and the exhibits, I find that when Trooper McNeil pulled his cruiser into the parking lot of the Store 24, the white car was parked in the last parking spot on the left (space marked “1" on exhibit 2), and that his police cruiser was positioned at an angle to the white vehicle such that it could not move. This resulted from a combination of the positioning of the police cruiser and the configuration of the parking lot as shown in exhibit 2.[3]
DISCUSSION
1. Seizure of the Handgun from the White Vehicle
This is a case in which the outcome turns on the determination of the moment when the seizure occurred. See Commonwealth v. Barros, 431 Mass. 171, 173 (2001). The test for making that determination is settled. In Commonwealth v. Smigliano, 427 Mass. 490, 491 (1998), the Supreme Judicial Court held that “[a] seizure takes place within the meaning of the Fourth Amendment to the United States Constitution, see Terry v. Ohio, 392 U.S. 1 (1968), and art. 14 of the Massachusetts Declaration of Rights ”if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Commonwealth v. Stoute, 422 Mass. 782, 786 (1996), quoting Commonwealth v. Borges, 395 Mass. 788, 791 (1985)." When Trooper McNeil pulled his police cruiser into the parking lot behind the white vehicle, he transformed a surveillance, which requires no justification, see Commonwealth v. Williams, 422 Mass. 111, 116 (1996), into the stop of a motor vehicle and the detention of its occupants which requires “some level of justification.” Smigliano, 427 Mass. at 492. See Commonwealth v. Barros, 431 Mass. at 176. Accord, Commonwealth v. Helme, 399 Mass. 298, 299 (1987) (there was an investigatory stop requiring justification where officer parked police cruiser so as to block the defendant’s car); Commonwealth v. King, 389 Mass. 233, 241 (1983) (there was a seizure requiring justification when officer repositioned his cruiser to block the defendant’s car in place).
A police officer may stop a motor vehicle to make a threshold inquiry where suspicious conduct gives the officer reason to suspect that a person has committed, is committing, or is about to commit a crime. Commonwealth v. Silva, 366 Mass. 402, 405 (1966). The standard is objective: “would the facts available to the officer at the moment of the seizure or the search warrant a [person] of reasonable caution in the belief that the action taken was appropriate?” Commonwealth v. Mercado, 422 Mass. 367, 369 (1996) (quotations omitted). The Commonwealth relies on Commonwealth v. Watson, 430 Mass. 725 (2000), as an example of a case in which seemingly innocent details added up to reasonable suspicion when filtered through the lens of police experience. However, in Watson, as the Supreme Judicial Court observed, there were objectives indicators that criminal activity was afoot. There, “[t]he troopers knew that Graneto’s [a suspected drug courier] actions satisfied some of the indicators for a drug dealer. They saw the defendants come in to the hotel with no luggage, enter Graneto’s room for a short period of time, and emerge with two heavy suitcases, which they loaded into a vehicle at about the same time that Graneto checked out of the hotel. After the defendants left the hotel parking lot, they drove erratically and evasively, in a manner that the officers could infer was intended to detect whether they were being followed, adding to the suspicion the officers already harbored.” Id. at 730. The present case involves a police surveillance which produced nothing more than several glances from the occupants of the vehicle under surveillance that the officer interpreted as suspicious in nature. Reasonable suspicion to support a motor vehicle stop cannot be based on a hunch regardless of the officer’s good faith or level of experience. Commonwealth v. King, 389 Mass. 233, 243 (1983).
*531 Although in other circumstances a police officer may approach a motorist and ask for a license and registration without effectuating a seizure, see Commonwealth v. Evans, 436 Mass. 369, 373 (2002), in the circumstances of this case even that request required some level of justification beyond a mere hunch. Contrast, Commonwealth v. Evans, 436 Mass. at 375 (officer was warranted in activating his cruiser’s blue lights and pulling in behind a vehicle parked in the breakdown lane to check on the safety of the occupants under the police community caretaking).
The seizure of the handgun from the front seat area of the white vehicle cannot be sustained under the plain view doctrine. “Under [the plain view] doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.” Commonwealth v. Santana, 420 Mass. 205, 211 (1995) (citations omitted). Here, the illegal seizure of the white motor vehicle forecloses any reliance on the plain view doctrine. See Commonwealth v. Blevines, 54 Mass.App.Ct. 89, 97 (2002). Because the seizure of the handgun was the direct result of the illegal detention of the motor vehicle, the evidence must be suppressed. Commonwealth v. Smith, 56 Mass.App.Ct. 569, 574 (2002).
2. Statements Made by Defendant Morillo
Defendant Morillo had exited the white motor vehicle and entered the Store 24 before he was arrested and advised of his rights. Although he was away from the vehicle, his arrest was the direct result of the illegal seizure of the white vehicle. Therefore, as the fruit of that illegality, his statement must be suppressed apart from any consideration of whether he understood and otherwise voluntarily waived his Miranda rights. See Commonwealth v. DaSilva, 56 Mass.App.Ct. 220, 226 n.9 (2002); Commonwealth v. Ruz, 55 Mass.App.Ct. 1111 (2002) (rescript).
ORDER
For the above reasons, the defendants’ motions to suppress are ALLOWED.

The rear seat passenger was Henry Tavares who is in default and did not participate in these proceedings.

There are three parking spaces on the left side of the parking lot in question that the court, with agreement of counsel, marked “1,” “2,” and “3,” on exhibit 2.

There was testimony by Trooper McNeil, which if believed, would permit an inference to be drawn that the white vehicle traveled at a rate of speed in excess of the posted speed limit and had committed a moving violation prior to when it pulled into the Store 24.1 do not credit this testimony.