COMMONWEALTH *VS.* PARRISH PHILLIPS
(and five companion cases[1]).

Suffolk. October 10, 2008. - November 24, 2008.

Present: MARSHALL, C.J., GREANEY, COWIN, CORDY, & BOTSFORD, JJ.

*Practice, Criminal,* Dismissal, Argument by prosecutor, Instructions to jury, Assistance of counsel, Capital case. *Threshold Police Inquiry. Search and Seizure,* Threshold police inquiry. *Constitutional Law,* Search and seizure, Identification, Assistance of counsel. *Arrest. Identification. Due Process of Law,* Identification. *Joint Enterprise. Homicide. Felony-Murder Rule. Robbery. Malice. Evidence,* Expert opinion. *Witness,* Expert.

A Superior Court judge properly denied a criminal defendant's pretrial motion to dismiss an indictment charging murder in the first degree, which did not specify each theory of murder alleged. [623]

A Superior Court judge did not err in denying a criminal defendant's motion to suppress both physical evidence obtained by police during a patfrisk and a subsequently obtained witness identification, where the defendant's detention and patfrisk by police resulted from a permissible investigatory stop, which was not elevated to an arrest by the actions of the police in handcuffing the defendant and placing him in a police wagon, a limited restraint commensurate with the purpose of stop and the defendant's evasive behavior [625-626]; moreover, the one-on-one showup identification by the witness, conducted promptly after the criminal event, did not take place in circumstances that were unduly suggestive [627-629].

At a murder trial, certain unchallenged remarks by the prosecutor in closing argument concerning the victim's injuries, and the suggestion of torture, did not constitute an improper attempt to inflame the jury's emotions, where the remarks were supported by evidence and relevant to the issue whether the defendants had acted with extreme atrocity or cruelty; further, one remark by the prosecutor was a fair attempt to humanize the victim in light of the defense's characterization. [629-631]

At the murder trial of two codefendants, the judge's instructions to the jury on joint venture felony-murder and knowledge of a weapon, which omitted an instruction requested by one defendant concerning a codefendant's knowledge that his joint venturer had a weapon, clearly and correctly conveyed the applicable law and did not give rise to a substantial likelihood of a miscarriage of justice. [631-632]

Certain residual errors claimed by one criminal defendant at a murder trial contained nothing of merit. [632]

At the murder trial of two codefendants, the Commonwealth produced suf-

---

[1]Three against Phillip Rise and two against Parrish Phillips.

ficient evidence to establish that one defendant was part of a joint venture [632-634], or acted as a principal [634-635], in the victim's murder.

At a murder trial, the judge did not abuse his discretion in admitting a witness's testimony regarding blood spatter evidence, where the record supported the judge's implicit discretionary finding that the witness was qualified to so testify [635-636]; furthermore, there was no merit to the defendant's ineffective assistance claim predicated on his counsel's failure to challenge those qualifications or to cross-examine the witness on alternative theories of blood spatter [637].

A codefendant at a murder trial failed to demonstrate that the prosecutor's remarks in closing argument exploited a witness's testimony, improperly suggested a motive for the murder, or improperly urged that a witness be believed. [636-637]

INDICTMENTS found and returned in the Superior Court Department on March 7, 2000.

Pretrial motions to suppress evidence were heard by *Peter M. Lauriat,* J.; the cases were tried before him; and a motion for a new trial, filed on August 15, 2006, and a motion for leave to adopt the new trial motion also were heard by him.

*Richard J. Shea* for Parrish Phillips.

*R. Bradford Bailey* (*Charles Dolan* with him) for Phillip Rise.

*Kristin Lombard O'Donnell,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. On the evening of January 11, 2000, the victim, Silverio Johnson, after being repeatedly stabbed, and severely beaten, was hung upside down from the window of his second-floor apartment and dropped to the ground. The victim survived the fall, but later died. A jury convicted the defendants, Parrish Phillips (Phillips) and Phillip Rise (Rise), of the victim's murder. The jury found the defendants guilty on all three theories of murder, deliberate premeditation, extreme atrocity or cruelty, and felony-murder (predicated on armed robbery).[2] The defendants were also convicted of armed robbery with a handgun and armed robbery with a knife or sharp instrument. The jury acquitted the defendants of home invasion.[3] The defendants' motions for a new

---

[2]The jury did not specify whether their convictions were based on principal or joint venture liability.

[3]Prior to trial, the trial judge dismissed the charge of assault and battery by means of a dangerous weapon against both defendants.

trial were denied by the trial judge.[4] The defendants appeal from the judgments of conviction and from the order denying their motions for a new trial.

Represented by new counsel on appeal, Phillips argues error in the denial of his motion to dismiss the homicide indictment, the denial of his motion to suppress, the prosecutor's closing argument, and the refusal of the judge to give an instruction in connection with the murder charge. He also requests that we exercise our authority under G. L. c. 278, § 33E, to reduce his murder conviction to a lesser degree of guilt or to order a new trial. He makes four other claims under the standards set forth in *Commonwealth* v. *Moffett*, 383 Mass. 201, 216-217 (1981). Rise, also represented by new counsel on appeal, argues that the evidence was insufficient to convict him, error occurred in the admission of the blood spatter evidence and in the prosecutor's closing argument, and his trial counsel provided ineffective assistance. We reject the arguments of both defendants and discern no basis on which to exercise our authority under G. L. c. 278, § 33E, to reduce the murder convictions to a lesser degree of guilt or to order a new trial.

Based on the Commonwealth's evidence, the jury could have found the following facts. On January 11, 2000, at approximately 11:45 P.M., police went to 951 Blue Hill Avenue, a three-family house in the Dorchester section of Boston, in response to a radio call. On arrival, the police found the victim, a known drug dealer who ran his business from his second-floor apartment, lying on the front lawn. The victim was alive and gurgling, with his head and face covered in blood. He was transported to a hospital, where he later died.

Earlier that evening, Shawn Echols and Courtney Woods (Woods), who were friends of the victim, arrived at the house where the victim lived. Woods entered the house while Echols stayed outside and spoke with a neighbor, Rhonda Woods (Rhonda). At some point, Rise, whom Echols knew, walked past Echols and greeted him. Rise, who was alone, approached the porch and Woods opened the door to let him in. Rise was wearing a tan jacket with a red and blue checkered shirt. Seconds later, from across the street, Phillips and an unknown man ap-

---

[4]Phillips was permitted to adopt Rise's motion for a new trial.

proached the house. Woods let them in. Phillips was wearing a green army fatigue jacket with army fatigue pants; the other man wore a black baseball cap with a black leather jacket.

Shortly after the men entered the house, Echols heard gunshots and yelling. Echols looked up to see the victim hanging out of a second-floor window upside down. Echols saw people behind the victim, but could not see who was holding the victim. The victim remained suspended for about four seconds before being dropped to the ground. The victim landed on his head. Seconds later, Rise, Phillips, and the unknown male ran out of the front door of the house. Rise was carrying something wrapped in a sheet.

The police arrived and questioned Echols. He told them what he had observed, provided them with a description of each of the three men, and indicated the direction in which they ran. Over a police channel, a police officer broadcast a description of the three men: three black males — one wearing a leather jacket; one wearing an army-type, olive colored jacket; and one wearing a tan jacket. Echols entered a police cruiser to assist the police in making an identification of the men. Other officers, however, located the defendants. The defendants were not found together, but were found at least four city blocks apart.

Shortly after the broadcast, Officer Alvin Holder and his partner, Officer George Exilien, observed Phillips, who wore a green camouflage military jacket, behind a tree on Nightingale Street. Officer Holder attempted to stop Phillips, who did not immediately comply. Phillips gave contradictory answers about where he was going. As Officer Holder frisked Phillips he felt a wet spot on his clothes and, in a pocket, found a large wallet containing the victim's identification. In the yard next door to where he apprehended Phillips, about twenty feet away, Officer Holder (assisted by Officer Charles J. Cellucci, Jr.) found two loaded firearms, a Davis .380 caliber semiautomatic handgun and a Lorcin nine millimeter semiautomatic handgun, underneath an automobile raised on jack stands. Echols was brought to Phillips and identified him as one of the men he had seen entering and leaving the victim's apartment.

In the meantime, Officers Michael P. Murphy and George Beaulieu observed Rise slowly running up Millet Street toward

Harvard Street. Rise stopped running, began walking, and told the officers that the "boys" who had just shot that "dude" had run "down there," pointing behind him back down Millet Street. Rise then took off, running down Harvard Street. The officers left their cruiser to chase him. Rise jumped over a fence, turned onto Radcliffe Street, shed his jacket, and evaded the officers. The officers used their radio to enlist assistance from other officers.

Officers James Nolan and Cellucci soon thereafter observed Rise entering the back yard of 60 Radcliffe Street. After a struggle, the officers apprehended Rise by taking him to the ground. Rise told them, "You got me," "I give up," and "I am a victim." The officers retrieved a pair of black leather gloves and a blue knit hat from the ground underneath Rise. They also retrieved Rise's tan jacket on which there was a substantial amount of blood. Police brought Rise in their cruiser to Bernard Street, where Echols identified him. The third suspect was never apprehended.

The defendants were transported to a police station. Their clothes were taken and forwarded to the crime laboratory for analysis. As Officer Murphy waited for Rise in a reception area, Sergeant Daniel Keeler, approximately four feet away, spoke on the telephone. When Sergeant Keeler mentioned, in his telephone conversation, that some jewelry was found at the scene, Rise stated that he had lost some jewelry, namely, a rope chain and bracelet. Rise claimed the jewelry had been "ripped off him" and possibly could be found in the hallway of 951 Blue Hill Avenue.

The police searched the victim's apartment. On entering the three-family house, there was a foyer and a door that led to the first-floor apartment. To the right of the foyer area, there was another door that led to a set of stairs. These stairs went to the victim's second-floor apartment. On the stairs, police recovered a black bag containing "crack" cocaine.

Inside the victim's apartment, the police recovered almost $20,000 in cash, jewelry, marijuana, and cocaine. A glass panel on French doors leading to the living room was broken. A window in the living room also was broken. There were bloodstains and pools of blood throughout the victim's apartment, including

in the hallway, kitchen, bathroom, bedroom, living room, and on various items within. Blood was found outside the victim's apartment, including in the stairway leading to his apartment, in the first-floor hallway, on the outside porch door, on the stairs outside the house, and on the exterior siding of the house below the second-floor window from which the victim was dropped.

The victim died as a result of multiple stab wounds and blunt head trauma. He had thirteen stab wounds and twenty incised wounds[5] over his body. The victim had suffered trauma to his face, head, neck, arms, legs, abdomen, and lower portion of his chest. There was hemorrhaging in the area under his scalp, to the right and left temple, to the back of the scalp, and to the top of his scalp. The victim had multiple lacerations[6] on his lips, nose, forehead, scalp, and back of his head. These particular injuries were consistent with force inflicted by a blunt instrument, possibly a "gun." Additionally, the right side of the victim's skull was fractured, and the bones of his neck were traumatized, consistent with an injury to the top of a person's head, such as a fall. The victim had traces of cocaine in his system at the time of his death.

While fingerprints were present on the firearms recovered, there was insufficient ridge detail to make an identification. Testing conducted on the clothing of Phillips and Rise showed the presence of human blood. Human blood was also detected on Rise's personal property, including his wallet, a one dollar bill, his watch, and his plastic electronic organizer. Deoxyribonucleic acid (DNA) testing further showed that the victim's DNA was a possible source of the blood extracted from the Lorcin magazine, Phillips's jacket, Rise's jacket, and Rise's jeans.

A Boston police department criminalist, Michael Gorn, testified about the blood evidence recovered and analyzed during the investigation. He explained the differences between high, medium, and low-velocity impact spatter. High-velocity impact

[5]The medical examiner explained that "a stab wound is a wound from a cutting instrument that is deeper than [its surface length], whereas an incised wound . . . is a sharp force injury where the length on the surface is longer than the depth."

[6]The medical examiner testified that a "laceration" is not a sharp force injury, but rather, a tear that does not leave a "clean break between the sides of the wound."

spatter involves "a lot of force," such as a gunshot or an explosive, and breaks up blood into very small droplets. Medium-velocity impact spatter occurs "if you have an external force that's applied to an object [here the victim] and that external force is traveling anywhere from between five and twenty-five feet per second." Medium-velocity impact spatter may be determined by examining the pattern and size of the stains, the size being anywhere between one and three millimeters in diameter. Medium-velocity impact spatter is consistent with a beating, a stabbing, or a cutting. Low-velocity impact spatter does not involve an application of force, but rather, involves blood that falls under the force of gravity, such as blood falling to the ground after one cuts a finger. It also includes transfer stains. Gorn testified that many of the bloodstains in the victim's apartment constituted medium-velocity impact stains. He testified that certain bloodstains on the jackets of the defendants contained impact spatter.

The defendants did not testify or present any witnesses on their behalf. Both attempted to undercut Echols's credibility. Echols has a long history of drug abuse as well as a criminal record. On the night of the victim's murder, Echols had used crack cocaine. In addition, Phillips attempted to raise doubts about the adequacy of the police investigation. Similarly, Rise attempted to cast doubt on the accuracy of the blood spatter evidence.

We first take up the claims asserted by Phillips.

1. a. *Motion to dismiss.* Phillips argues that it was error to deny his motion to dismiss the indictment charging him with murder in the first degree because it failed to specify each theory of murder alleged. The argument he makes was considered and rejected in *Commonwealth* v. *DePace,* 442 Mass. 739, 742-743 (2004), cert. denied, 544 U.S. 980 (2005). The motion to dismiss was properly denied.

b. *Motion to suppress.* Phillips moved to suppress physical evidence and Echols's identification of him. He argued that his detention, and subsequent identification, were unlawful and in violation of his Federal and State constitutional rights. After an evidentiary hearing, the motions were denied by the trial judge. We summarize the judge's findings of fact, with minor supplementation from uncontested testimony, noting that all of

his findings are supported by the evidence he found credible. Consequently, we accept them. See *Commonwealth* v. *Sparks*, 433 Mass. 654, 656 (2001), and cases cited. We accord deference to the judge's factual findings, "but independently review[] the correctness of the judge's application of constitutional principles to the facts found."[7] *Commonwealth* v. *Magee*, 423 Mass. 381, 384 (1996), quoting *Commonwealth* v. *Mello*, 420 Mass. 375, 381 n.8 (1995).

At about 11:30 P.M. on January 11, 2000, the Boston police department received a telephone call concerning shots fired, or a person shot, at 951 Blue Hill Avenue. The first police unit responded to the scene within a few minutes. In the front yard, Officer Gregory Dankers observed the blood-covered body of a black male on the ground. On the house, he saw blood on the exterior wall below a second-floor window. To ascertain what had happened, Officer Dankers began interviewing several people at the scene. One witness, Shawn Echols, stated that he had heard gunshots and then saw his "uncle's" body[8] come out of the second-floor window, followed one minute later by three men running from the house. Echols told Officer Dankers that the men were black males, and that one wore a tan jacket, one wore a green jacket, and one wore a dark jacket. He also indicated the direction in which the men ran.

Officer Dankers broadcast this information over the police radio. Within a few minutes, officers of the police anti-gang unit had stopped three men outside a nearby liquor store. In a police cruiser, Officer Dankers brought Echols to that location and asked Echols if he could identify any of those individuals. Officer Dankers used the "take-down" lights on top of his cruiser to light up the area.[9] Echols stated that they were not the three men he had seen running from 951 Blue Hill Avenue.

A short time later, Officer Alvin Holder and another officer, who were searching an area near the scene of the crime looking

---

[7]Because art. 14 of the Massachusetts Declaration of Rights provides greater substantive protection to a criminal defendant than does the Fourth Amendment to the United States Constitution, we view the contested detention under those more stringent standards. See *Commonwealth* v. *Williams*, 422 Mass. 111, 115 n.9 (1996).

[8]The victim "was like an uncle" to Echols so he called him that.

[9]The "take-down" lights illuminate an area better than a cruiser's headlights.

for the men described in the police radio broadcast, observed a green-colored object behind a tree in front of a red house on Nightingale Street. As they watched, the green object moved. The officers left their patrol wagon and saw a black male, later identified as Phillips, wearing a green jacket, crouched down behind the tree. Phillips appeared to fit the description of one of the subjects of the radio broadcast.

Although the officers ordered Phillips to stop, he climbed over a railing onto the porch of the red house. After several more commands to stop, to show his hands, and to drop to the ground, Phillips began to comply. At this point, the officers grabbed and handcuffed him (with his hands behind his back), conducted a patfrisk, and asked him who he was and where he was going. Phillips was sweating profusely, his heart was racing, and his answers to the officers' questions did not make sense. During Officer Holder's patfrisk of Phillips's jacket, he felt a hard object, which turned out to be a wallet that belonged to the victim. Officer Holder also felt a damp stain on Phillips's jacket. At about the same time, other officers who had arrived at the scene found two handguns under a motor vehicle. The handguns were found in the yard of the house adjacent to the yard in which Phillips had been apprehended.

After securing Phillips, the officers placed him in the back of their patrol wagon. At this time, the officers were uncertain as to the full nature and scope of the incident and were holding Phillips pending further clarification. On their radio, they made contact with Officer Dankers, who said that he would bring Echols to their location. About ten minutes later, Officer Dankers arrived with Echols. The other officers brought Phillips out of the patrol wagon and stood on each side of him, in the presence of several other officers. Officer Dankers illuminated the area where they stood with his cruiser's "take-down" lights. Echols looked at Phillips and identified him to Officer Dankers as one of the men who had run from the house. Officer Dankers relayed Echols's identification to the officers standing with Phillips, who then returned him to the patrol wagon and transported him to a police station.

Phillips argues that his detention, prior to Echols's identification of him, did not result from a permissible investigatory stop, but rather constituted an arrest that was not supported by prob-

able cause. An investigatory stop is justified under art. 14 of the Massachusetts Declaration of Rights if the police have "reasonable suspicion" to conduct the stop. See *Commonwealth* v. *Willis*, 415 Mass. 814, 817 (1993); *Commonwealth* v. *Cheek*, 413 Mass. 492, 494 (1992). Under this standard, the officer's suspicion must be based on specific, articulable facts and reasonable inferences that the defendant has committed, is committing, or was about to commit a crime. *Commonwealth* v. *Willis*, *supra*. See *Terry* v. *Ohio*, 392 U.S. 1, 19-20 (1968). We view the facts and circumstances in their entirety in assessing the reasonableness of the officers' conduct. *Commonwealth* v. *Williams*, 422 Mass. 111, 116 (1996). "[A] combination of factors that are each innocent of themselves may, when taken together, amount to the requisite reasonable belief." *Commonwealth* v. *Fraser*, 410 Mass. 541, 545 (1991). The Commonwealth bears "the burden of demonstrating that the police officers acted lawfully in pursuing and seizing the defendant." *Commonwealth* v. *Williams*, *supra* at 115-116.

The Commonwealth satisfied its burden. The detention of Phillips occurred approximately twenty minutes after the victim had been dropped from the second-story window of 951 Blue Hill Avenue. Police were notified of "shots fired" and promptly arrived at the scene. There they observed the victim's body covered in blood and spoke with Echols who reported that he had witnessed the victim's body being dropped from the window and saw, one minute later, three men together flee the house. The content of the officer's radio call, regarding the description of the suspects and the direction in which they had ran, came from Echols.

Phillips's claims that the description of him given by Echols (a black male wearing a green jacket) was insufficient to justify his stop. He ignores the entire circumstances surrounding his stop, namely, the temporal proximity of the stop to the reported crime, his geographical proximity to the scene of the reported crime, his presence in a location that matched the reported direction in which the suspects had fled, and his bizarre conduct of crouching behind a tree in front of a house. Based on all these facts, as well as Phillips's match to a general description of one of the suspects, the police possessed the requisite reasonable suspicion to justify Phillips's stop. See *Commonwealth* v. *Mercado*, 422 Mass. 367, 371 (1996).

We reject Phillips's contention that, by the officers' handcuffing him and placing him in a police wagon (until Echols made the identification), the detention constituted an arrest. A "justifiable threshold inquiry permits a limited restraint of the individuals involved as long as their detention is commensurate with the purpose of the stop." *Commonwealth* v. *Feyenord*, 445 Mass. 72, 77 (2005), cert. denied, 546 U.S. 1187 (2006), quoting *Commonwealth* v. *Torres*, 424 Mass. 153, 162 (1997). "The degree of suspicion the police reasonably harbor must be proportional to the level of intrusiveness of the police conduct." *Commonwealth* v. *Feyenord, supra,* quoting *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 323 (2001). As conceded by Phillips, he acted "evasively" when stopped. The police reasonably could have viewed Phillips's movement to the front porch of the house, and noncompliance with police commands, as an attempt to flee, and physically restrained him. The fact that they also handcuffed Phillips is not dispositive. See *Commonwealth* v. *Williams, supra* at 118, and cases cited. Because of the violent nature of the reported crimes, his attempt to flee, and the possible danger to the safety of the officers as well as the potential occupants of the house, the scope of Phillips's detention was permissible. *Id.* at 118-119. He was handcuffed and placed in the patrol wagon for only ten minutes until Echols made his positive identification. The brief detention was made with the permissible purpose of completing the identification. We add that Phillips's short detention in this manner, and for this purpose, was further justified when, minutes after he was handcuffed, the officers who had detained him learned that other officers had found two handguns nearby. The police did not exceed the scope of a lawful investigatory stop when they handcuffed and detained Phillips. See *id.* at 117-119.

We reject Phillips's contention that Echols's one-on-one identification, or showup, of him was unduly suggestive. "One-on-one identifications are generally disfavored because they are viewed as inherently suggestive." *Commonwealth* v. *Martin*, 447 Mass. 274, 279 (2006). However, we have stated:

"[A] one-on-one pretrial identification raises no due process concerns unless it is determined to be *unnecessarily* suggestive. Whether an identification procedure is 'unneces-

> sarily' or 'impermissibly' suggestive . . . involves inquiry
> whether good reason exists for the police to use a one-on-
> one identification procedure . . . bearing in mind that . . .
> '[e]xigent or special circumstances are not a prerequisite to
> such confrontation.' " (Emphasis in original.)

*Id.,* quoting *Commonwealth* v. *Austin,* 421 Mass. 357, 361 (1995).
"It is the defendant's burden to prove by a preponderance of
the evidence that the showup was 'so unnecessarily suggestive
and conducive to irreparable mistaken identification as to deny
[him] due process of law.' " *Commonwealth* v. *Martin, supra* at
279-280, quoting *Commonwealth* v. *Odware,* 429 Mass. 231,
235 (1999). Phillips cannot satisfy this burden.

"[S]howups of suspects to eyewitnesses of crimes have been
regularly held permissible when conducted by the police promptly
after the criminal event." *Commonwealth* v. *Bowden,* 379 Mass.
472, 479 (1980), quoting *Commonwealth* v. *Barnett,* 371 Mass.
87, 92 (1976), cert. denied, 429 U.S. 1049 (1977). Here, Echols
had witnessed part of the criminal event (the victim's being
dropped from the second-story window) and had witnessed, one
minute later, three men running out of the victim's house. Echols's
ability to provide a description of each of the men permitted the
inference that he had had ample time to view them. The showup
involving Phillips occurred within one hour of the crime and the
identification was made by Echols without hesitation. See, e.g.,
*Commonwealth* v. *Correia,* 381 Mass. 65, 71 (1980); *Common-
wealth* v. *LaPierre,* 10 Mass. App. Ct. 641, 642-644 (1980).

Contrary to Phillips's argument, the identification procedure
was not unnecessarily suggestive because Echols may have heard
on the police radio that he was about to view a suspect. See
*Commonwealth* v. *Harris,* 395 Mass. 296, 299 (1985). A witness
ordinarily expects to be asked to make an identification of some-
one who either fits the description of a suspect or is suspected to
have been involved in the reported crime. See *id.* The facts that
Phillips had been detained in a police wagon, was handcuffed,
and was flanked by two police officers during the investigation
did not render the procedure unnecessarily suggestive. See *Com-
monwealth* v. *Austin, supra* at 361-362; *Commonwealth* v. *Walker,*
421 Mass. 90, 93-95 (1995); *Commonwealth* v. *Florek,* 48 Mass.
App. Ct. 414, 419 (2000). Illumination by means of the "take-

down" lights did not add to the suggestiveness of the identification when the identification was taking place in the early morning. See *Commonwealth* v. *Drane,* 47 Mass. App. Ct. 913, 913-914 (1999), and cases cited.

The police had good reason to conduct the showup in this manner. They were investigating violent crimes in which three suspects had fled and had not been apprehended. The need for public safety was critical, and a prompt identification served to limit risk to the public and to avoid the escape of dangerous suspects. See *Commonwealth* v. *Austin, supra* at 364; *Commonwealth* v. *Barnett, supra.* The prompt identification also tended to make the identification accurate because Echols's recollection would be fresh. See *Commonwealth* v. *Walker, supra* at 95. The fact that Echols had just viewed three other men (outside a liquor store) without an identification did not render his identification of Phillips unnecessarily suggestive. Rather, the fact that he had been exposed to a series of showups served to "ameliorate[] the suggestiveness of [the] one-on-one identification." *Commonwealth* v. *Martin, supra* at 281.

c. *Prosecutor's closing argument.* Phillips challenges portions of the prosecutor's closing argument as improper attempts to inflame the jury's emotions.[10] He also asserts that one statement

---

[10]The challenged statements appear in different places of the prosecutor's closing argument, and are as follows:

"Ladies and gentlemen, no one deserves to die the way [the victim] died on that night. No one. The cuts, the bruises, the stabs, the broken face, the broken head, no one deserves to die that way.

"And [Phillips's trial counsel is] right, I'm going to show pictures. Because you know what, this is what they did to [the victim]. And you'll have them when you [deliberate]. This is what they did to [the victim]. Stab wounds to all parts of his body, including his chest. Split open the skin, the tissue of his body. That's what they did to [the victim]. And for what? Money? Drugs? Do that to a person for money and drugs? That's what they did. . . .

"Do you know what's even more probably tragic or more probably disgusting? They didn't have to kill him when they were up there. They didn't have to torture him and kill him. . . . If they just held him down there and they bothered to take the time to go look, then they would have found the money [in the victim's apartment]. But they didn't. So what they did instead, this is the result. . . .

"So I ask you to find them guilty of all three theories [of murder]

repeated by the prosecutor did not argue the evidence.[11] Phillips did not object to the challenged remarks.

We review the prosecutor's closing argument in its entirety, in the context of the jury instructions and the evidence at trial. *Commonwealth* v. *Cosme*, 410 Mass. 746, 750 (1991), and cases cited. "Counsel may argue from the evidence and may argue fair inferences that might be drawn from the evidence." *Commonwealth* v. *Murchison*, 418 Mass. 58, 59 (1994). The victim's injuries were disturbing, and the extent of those injuries and the suggestion that the victim had been tortured was supported by the evidence. The medical examiner testified in detail about the multiple injuries, including thirteen stab wounds, sustained by the victim. Based on the blood evidence in the victim's apartment, and a police officer's testimony that the victim was still alive and gurgling after having been dropped from the second-floor window, the jury could have inferred that the victim had been tortured before he died. The fact that the defendants were responsible for the victim's injuries and death could reasonably be inferred from (among other evidence) the presence of blood spatter (of the victim's blood) on their clothes. The fact that the defendants inflicted the injuries over money or drugs could reasonably be inferred from the evidence that the victim used his apartment to sell drugs, that Phillips was apprehended with the victim's wallet on his person, that Rise fled from the apartment with a sheet covering something, and that a bag with crack cocaine was left in the second-floor stairwell to the victim's apartment.

The prosecutor's statements concerning the victim's injuries, and the suggestion of torture, were relevant to whether the defendants acted with extreme atrocity or cruelty. See *Commonwealth* v. *Kent K.*, 427 Mass. 754, 760 (1998). Further, the prosecutor's remarks that no one deserved to die the way the victim had were a fair attempt to humanize the victim, who repeatedly had been depicted by Phillips's trial counsel as a drug dealer living in a

because you might ask yourself, well how can someone do this to a person. The answer is, they can't. They can't, at least, and get away with it. And by a guilty verdict you're saying they can't. And I ask you to return verdicts of guilty."

[11]The statement is: "That's what they did to [the victim]."

"drug warehouse." See *Commonwealth* v. *Vizcarrondo*, 431 Mass. 360, 363 n.3 (2000). There was no error.

d. *Jury instructions on joint venture and knowledge of a weapon.* At the conclusion of the judge's instructions to the jury, Rise requested that, for "joint venture," the jury be told that, to convict Rise as a joint venturer, they must find that Rise "knew that the individual who assaulted the victim possessed a gun or a knife before the assault occurred." Phillips did not join in this request, but now claims that the refusal to give Rise's requested instruction, in connection with the instructions on joint venture felony-murder and deliberately premeditated murder, prejudiced him. There is no substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Almonte*, 444 Mass. 511, 522-523 (2005).

"To be convicted on a theory of joint venture for a crime that has possession of a weapon as one of its elements, the joint venturer must be shown to have had knowledge that the principal perpetrator had a weapon." *Commonwealth* v. *Ellis*, 432 Mass. 746, 762 (2000). This knowledge must be established, beyond a reasonable doubt, in cases involving a theory of joint venture premeditated murder "during which another person carried and used the [weapon]," *Commonwealth* v. *Green*, 420 Mass. 771, 779 (1995), quoting *Commonwealth* v. *Lydon*, 413 Mass. 309, 312 n.2 (1992), which was a theory on which the Commonwealth proceeded at trial.

The judge instructed on joint venture felony-murder that "[t]he Commonwealth must prove beyond a reasonable doubt that the defendant knew that one or more of his joint venturers had a weapon." The instruction tracks our model instruction on "joint venture and knowledge of a weapon" appearing in the Model Jury Instructions on Homicide. See Model Jury Instructions on Homicide 64 (1999). The instruction clearly and correctly conveyed the applicable law. See *Commonwealth* v. *Owens*, 414 Mass. 595, 607 (1993).

The omission of an instruction concerning a defendant's knowledge that one or more of his joint venturers had a weapon, in the context of deliberately premeditated murder, could not have created a substantial likelihood of a miscarriage of justice. The jury necessarily found that the defendants knew of the existence of a

weapon, or weapons, because they were convicted of armed robbery. The judge correctly instructed the jury that, to prove armed robbery, the Commonwealth must prove beyond a reasonable doubt "that the defendant or defendants were armed with a dangerous weapon," or to prove joint venture armed robbery, "that [each] defendant knew that one or more of his joint venturers had a weapon."

e. Moffett *claims*. Phillips's claims, argued under *Commonwealth* v. *Moffett*, 383 Mass. 201, 208 (1981), contain nothing of merit.

Contrary to Phillips's assertion, the prosecutor laid a proper foundation for the DNA analyst to testify that, based on statistical tables, a high level of probability existed that the victim's blood was the source of bloodstains found on Phillips's clothing and one of the handguns located near him. The judge properly overruled the objection made by Phillips's trial counsel to the testimony.

The jury were well aware of Echols's long-standing drug use and his admission that he "did some cocaine" on the night of the victim's murder. The judge did not err, therefore, in refusing the request by Phillips's trial counsel to instruct the jury that the adoption by Echols of a prior inconsistent statement (concerning the use of drugs on the night of the victim's murder) made the statement substantive evidence.

The judge's instruction, in connection with the theory of extreme atrocity or cruelty, on third prong malice quoted verbatim the instruction recommended in the Model Jury Instructions on Homicide, *supra* at 12. There was no need to instruct further on the subject.

The prosecutor argued, as a basis for armed robbery in connection with the felony-murder charge, that Phillips and Rise went into the victim's apartment "[t]o get the money, drugs and anything else they could get." Theft of cocaine constitutes the theft of property for purposes of armed robbery. There was ample evidence that Phillips used force and violence to take money or property from the victim with the intent to steal, thereby warranting the jury's verdict of guilty on the charge of felony-murder.

We now address the claims of Rise.

2. a. *Sufficiency of the evidence*. At the close of the Com-

monwealth's case, Rise moved for a required finding of not guilty, which was denied. Rise maintains that there was insufficient evidence to establish that he was part of a joint venture, or acted as a principal, in the victim's murder. We review his arguments pursuant to the well-established standards set forth in *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979).

We first take up Rise's contentions, with respect to the joint venture theory of liability, that the Commonwealth did not prove that he had participated in the victim's murder or had the requisite mental state, namely, knowledge that another intended to commit the murder. To prove a joint venture to commit murder, the Commonwealth must prove, beyond a reasonable doubt, that the defendant was (1) present at the scene of the crime; (2) with knowledge that another intends to commit the crime; and (3) by agreement is willing, and available, to help if necessary. *Commonwealth* v. *Maynard*, 436 Mass. 558, 564 (2002). Rise argues that the Commonwealth proved only his presence in the house in which the victim lived (and not inside the victim's apartment) at the time of the brutal (and ultimately fatal) attack on the victim. While mere presence at the commission of a crime is insufficient to establish joint venture liability, see *Commonwealth* v. *Perry*, 432 Mass. 214, 223 (2000), the Commonwealth's evidence, and reasonable inferences permissibly drawn from that evidence, established Rise's participation in the attack, or his agreement to help in its commission if necessary, as well as the requisite mental state.

Based on the presence of stains consistent with the victim's blood throughout his apartment and on Rise's jacket, the jury could have reasonably inferred that Rise was not just present in the three-family house at the time of the attack, but rather, had been inside the victim's apartment when the victim had been attacked. Based on the presence of the victim's blood on Phillips's jacket and the fact that Phillips had been apprehended with the victim's wallet in his possession and with two handguns nearby, one magazine of which contained the victim's blood, the jury reasonably could have inferred that Rise and Phillips had been together at the time of the attack on the victim and that Phillips had used one of the handguns to inflict at least some of the victim's injuries. That evidence, as well as the impact spatter

evidence, and evidence that both defendants fled together (with Rise carrying something under a sheet) within seconds of the victim being dropped from his second-floor window, was sufficient to establish Rise's participation (or willingness to help) in the attack that resulted in the victim's death.

Rise attempts to circumvent the inferences that reasonably could be drawn by claiming that, because of all the blood in the victim's apartment, "logic" suggests that Rise ended up with the victim's blood on his jacket by coming into contact with someone who had just been inside the victim's apartment. That argument ignores the impact spatter on both Rise's jacket and Phillips's jacket, from which the jury could have inferred that Rise (or Phillips, or both) had inflicted the injuries causing the bloodshed or had stood by to lend assistance to each other in causing the bloodshed.[12] From this same evidence, and the evidence that Rise fled the victim's apartment at the same time as Phillips (and the other man), while hiding something under a sheet, the jury permissibly could have inferred that Rise knew Phillips had intended to commit the crimes and had participated, or stood by, to lend assistance.

The Commonwealth was not required to prove exactly how Rise participated in the victim's murder. See *Commonwealth* v. *Bianco*, 388 Mass. 358, 367, *S.C.*, 390 Mass. 254 (1983), or that no one else could have committed the crime, see *Commonwealth* v. *Lodge*, 431 Mass. 461, 466 (2000). Further, when the evidence establishes that two individuals are culpable for a crime, "but the evidence fails to establish who was the principal and who was the joint venturer, a jury are warranted in inferring that both were either the principal or the joint venturer." *Commonwealth* v. *Williams*, 450 Mass. 894, 898 (2008).

Rise's challenges to the sufficiency of the evidence with respect to his liability as a principal for the victim's murder also fail. There was sufficient evidence to prove that Rise deliberately

---

[12]That more than one person inflicted the victim's injuries could have been inferred based on the extensive and different injuries to the victim, namely thirteen stab wounds, twenty incised wounds, multiple lacerations, and other trauma. See *Commonwealth* v. *Palmariello*, 392 Mass. 126, 132 (1984). For instance, the jury could have inferred that one defendant had stabbed the victim, while the other beat him with a sharp blunt instrument, such as a handgun.

premeditated the murder. "[T]he law does not require a particular length of time to show deliberate premeditation." *Commonwealth* v. *Guy*, 441 Mass. 96, 101 (2004), citing *Commonwealth* v. *Coren*, 437 Mass. 723, 730 (2002). A plan may take only seconds to form. *Commonwealth* v. *Coren*, *supra*. The jury could have inferred deliberate premeditation based on the nature and extent of the victim's injuries (which involved the use of a knife, a handgun, and dropping him from a second-floor window head first), as well as the relatively lengthy nature of the attack which could be inferred from the blood found throughout the victim's apartment. See *Commonwealth* v. *Dagley*, 442 Mass. 713, 726 (2004), cert. denied, 544 U.S. 930 (2005); *Commonwealth* v. *Guy*, *supra* at 102-103 & n.6; *Commonwealth* v. *Richard*, 377 Mass. 64, 66 (1979); *Commonwealth* v. *Reddick*, 372 Mass. 460, 462 (1977).

Rise's argument that there was insufficient evidence of the malice required to support extreme atrocity or cruelty is based on his perceived lack of evidence to show that he participated in the attack. Because we have concluded that the evidence was sufficient to establish that Rise had participated in the victim's attack, the argument lacks merit.

Finally, we reject Rise's contention that there was insufficient evidence, with respect to felony-murder, that he was armed or had participated in a robbery of the victim. The jury reasonably could have inferred that Rise hid a knife or other weapon, or drugs, under the sheet when he fled the victim's apartment. From the victim's blood on Rise's jacket, and the impact spatter, the jury also could have inferred that Rise had inflicted at least some of the victim's injuries. The evidence that a handgun containing the victim's blood had been recovered in the vicinity where Phillips had been apprehended allowed the jury to infer that Rise had been the one to inflict the stab wounds to the victim. Further, a bag containing crack cocaine was recovered on the stairs to the victim's apartment. The jury could reasonably have inferred that Rise had dropped the bag on the stairs in his haste to flee the house.

b. *Admission of blood spatter evidence.* Rise argues that the judge abused his discretion in admitting the blood spatter evidence because there was "no expert qualification and founda-

tion" for Gorn's testimony on the subject. Rise did not object to Gorn's testimony on these grounds at trial. We reject the argument. Gorn's educational and work experience, certifications, professional memberships, and training in forensic science and blood stain pattern analysis, in particular, supported the judge's implicit discretionary ruling that Gorn was qualified to testify on impact spatter.[13] See *Commonwealth* v. *Frangipane*, 433 Mass. 527, 533 (2001); *Commonwealth* v. *Rivera*, 425 Mass. 633, 644 (1997). A witness's lack of previous trial testimony, if such were the case, would not disqualify him from testifying as an expert. *Commonwealth* v. *Rhoades*, 379 Mass. 810, 818 (1980). Rise overlooks the significance of Gorn's possession of a bachelor of science degree in biology as opposed to chemistry, and ignores the fact that he obtained a masters of science degree in criminalistics.

c. *Prosecutor's closing argument.* During his direct examination, Officer Cellucci testified that police recovered two firearms about twenty feet away "from where the suspect was captured." We reject Rise's claim that the prosecutor prejudicially exploited this testimony by failing to specify, in a portion of her closing argument, which defendant had been apprehended near the firearms.[14] Shortly after making the above statement, Cellucci testified about the apprehension of a second suspect, identifying Rise by name. Cellucci's testimony left no doubt that it was not Rise who was apprehended near the firearms. Further, Rise improperly views the prosecutor's remark in isolation. Earlier in her argument, she made it clear that it was Phillips who had been apprehended near the firearms, and described Rise's apprehension in detail. There was no error.

Rise challenges the prosecutor's hypothetical account of the crime, in which she suggested that the victim was injured in an effort to locate money or drugs in the apartment. There was evidence that the victim was a known drug dealer who sold drugs from his apartment. The victim's injuries were extensive and, based on the blood evidence, were inflicted throughout the

---

[13]The judge was not required to qualify Gorn as an expert before the jury. See *Commonwealth* v. *Frangipane*, 433 Mass. 527, 530 n.4 (2001).

[14]The prosecutor stated: "Is it a coincidence that the people [Echols] identified, [the victim's] blood is on the gun twenty-five feet away?"

apartment (before he was dropped out of a window). Phillips was apprehended with the victim's wallet in his pocket. Rise was seen fleeing the apartment holding a sheet that covered something. A black bag with crack cocaine was recovered from the second-floor stairwell, and drugs and a large sum of money were found in the victim's apartment. Based on this evidence and on reasonable inferences that could be drawn fairly from it, the prosecutor's argument was proper. See *Commonwealth* v. *Pope*, 406 Mass. 581, 587 (1990).

We reject Rise's contention that, in her closing argument, the prosecutor improperly suggested that Echols should be believed because he showed up in court and testified. Read in its entirety, the prosecutor suggested that the jury believe Echols because his testimony was corroborated by the blood evidence. The argument directly responded to the assertions made by the defendants' trial counsel that Echols was not a credible witness. The argument was proper. See *Commonwealth* v. *Sanders*, 451 Mass. 290, 297 (2008).

d. *Ineffective assistance of trial counsel.* Because the judge did not abuse his discretion in implicitly qualifying Gorn as an expert on blood spatter, there is no merit to Rise's ineffective assistance of trial counsel claim predicated on his trial counsel's failure to "challenge" Gorn's qualifications. Rise's remaining claim of ineffective assistance, based on his trial counsel's failure to cross-examine Gorn on alternative theories on how the victim's blood may have transferred to Rise's clothing, also fails. We review the claim "to determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than is the general constitutional standard for determining ineffective assistance of counsel." *Commonwealth* v. *Frank*, 433 Mass. 185, 187 (2001). We agree with the judge, who decided the issue adversely to Rise in his decision denying Rise's motion for a new trial, that the claim fails because Rise did not sufficiently support the claim with an expert affidavit identifying any alternative theories for the presence of blood spatter on Rise's jacket, an affidavit from trial counsel, or a showing that better work might have accomplished something material for the defense.

3. *Review pursuant to G. L. c. 278, § 33E.* There is no basis for relief under G. L. c. 278, § 33E, for either defendant.

*Judgments affirmed.*

*Order denying motions for a new trial affirmed.*